McCONNELL v. CAMORS–McCONNELL CO.

(Circuit Court of Appeals, Fifth Circuit. March 5, 1907. **On Rehearing** April 15, 1907.)

No. 1,612.

1. EVIDENCE—PAROL EVIDENCE—CONTRACTS.

Where a contract for the sale of a business sought to be enforced was only partially in writing, defendant was entitled to prove the balance by parol in order to establish that it was void as in restraint of trade.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 20, Evidence, §§ 1882. 2027.]

2. CONTRACTS—VALIDITY—RESTRAINT OF TRADE.

Where a contract for the sale of a business in which defendant was formerly a partner provided for the organization of complainant corpo- ration in order that another corporation, which was practically a trust, organized to monopolize the business in which complainant was engaged, and declared that for a specified period defendant should not enter into a competing business, after which, and as a part of the arrangement, the trust corporation acquired a monopoly of the business in the United States and stifled competition, the contract was in violation of Act Cong. July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200], to pre- vent unlawful restraints and monopolies, and was therefore unenforce- able.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 11, Contracts, §§ 547– 555; vol. 27, Injunction, §§ 120–123.]

3. SAME—PARTIES.

Where a contract for the organization of plaintiff corporation was made for the purpose of enabling a trust organized to monopolize the business to control it, and the trust interest in the corporation was rep- resented by P. in person, who was president of the trust, it was no answer, to an objection that the contract was void as in restraint of trade, that the trust corporation was not a formal party to the proceeding.

Appeal from the Circuit Court of the United States for the Southern District of Alabama.

See 140 Fed. 412.

We find this case stated accurately in the printed brief filed by the solicitors for the appellant. from which it appears that:

This cause was commenced by a bill in chancery originally filed November 30, 1904, by Andrew W. Preston and Camors-McConnell Company against Herbert L. McConnell, seeking to enjoin the defendant from violating the fifth paragraph of what purports to be a contract made on the 8th day of December, 1899, between Andrew W. Preston, of the first part, J. B. Camors and Herbert L. McConnell, composing the firm of Camors, McConnell & Co., of the second part, and several other parties who were interested in the busi- ness of Camors, McConnell & Co., of the third and fourth parts. The alleged contract recites that Camors, McConnell & Co. were engaged in the business of growing, importing, and selling tropical fruits, and desired to transfer their business, good will, etc., to a corporation to be organized; that the other parties to the contract had some interest in the business of Camors, McCon- nell & Co., and Preston desired to obtain an interest in the new corporation; that in consideration of the premises, and the mutual agreements of the parties, and $1 paid, it was agreed:

(1) That Preston should cause a corporation to be formed under the laws of New Jersey, to be called the "Camors-McConnell Company," with a capital stock of $60,125, divided into shares of $100 each, with power to carry on the business of Camors-McConnell Company, and to be governed by a board of five directors.

152 F.—21

(2) That Camors, McConnell & Co. should transfer to the new corporation all of their property, good will, etc., and receive therefor 521 shares of the capital stock of the new corporation. The property to be purchased was set out in the first schedule attached. The new corporation was to assume the debts and liabilities of Camors, McConnell & Co. specified in the second schedule attached.

(3) That Preston should buy and Camors, McConnell & Co. sell to him, or his assigns, 161 shares of the stock of the new corporation for $30,000 in cash; that in order that Preston should retain, as long as he desired, the power to elect three of the five directors of the new corporation, and the other stockholders should elect two, Preston should transfer and assign one share of his stock to a trustee, to be named by him, to be held in trust and to be voted in all elections of directors for such three directors as Preston or his assigns should nominate, and for such two directors as the owners of 160 shares of the capital stock should nominate, but that such one share should not be voted for any other purpose, and should not participate in the dividends of the company.

(4) That Preston should subscribe for 80 shares of the stock of the new corporation, and pay $10,000 therefor, and that the other parties should subscribe for 80 shares of such stock, and pay $10,000 therefor.

(5) "That said J. B. Camors and Herbert L. McConnell, Louis Weinberger, Jacob Weinberger, Rudolf Braden, J. W. Kroesmann, Ernst Braden and John C. Dehls, hereby jointly and severally covenant and agree that they will not, either individually or by or through a corporation, jointly or severally, directly or indirectly, engage in the growing or importing or selling of tropical fruits or any other business directly or indirectly in competition with the new corporation, or with the United Fruit Company, except through the new corporation, until after the said Camors-McConnell Company, the new corporation shall have ceased the active continuance and prosecution of the business of importing and selling such fruit, or shall have failed to have shown a profit for any calendar year after 1899. All profits earned by the new corporation shall be divided every three months by dividends declared. This provision shall not exclude any of the parties hereto from being concerned in the business or businesses of the Bluefields Steamship Company, Ltd., of the Camors-Weinberger Banana Company, Ltd., or the Orr-Laubenheimer Company, and provided further this provision shall not exclude Kroesmann, Braden & Co., J. W. Kroesmann, Ernst Braden, John C. Dehls or Rudolf Braden from engaging in a general mercantile business or from exporting cocoanuts or other produce, excepting tropical fruits."

(6) That the parties, other than Preston, should cause ·to be executed all conveyances and assignments necessary, in the opinion of H. Pillans, Esq., to carry out these agreements.

(7) That the parties, other than Preston, should make all such other covenants and conveyances as should be necessary and convenient to carry out the contract according to its true intent.

(8) That Preston should use his influence to retain McConnell as manager of the new corporation as long as he would act, provided, in Preston's opinion and that of a majority of the remaining stockholders, McConnell was a fit person therefor, and if he was deemed an unfit person, or was unwilling to longer serve, then that Preston should use his influence that the manager should be a person agreeable to the stockholders other than himself and assigns, provided he was, in Preston's opinion, a competent and fit person.

(9) That the new corporation should purchase from certain other persons certain property—set out in the third schedule.

(10) That the new corporation should buy certain other property therein named.

(11) That the new corporation should enter into certain agreements with Kroesmann, Braden & Co. for a period of 10 years, which should contain certain provisions similar to the provisions of another contract there referred to.

(12) That the directors of the new corporation should receive no compensation.

Attached to this contract was an extract from the additional contract provided by the eleventh paragraph of the contract, and also schedules there referred to.

The bill of complaint alleges that the Camors-McConnell Company (the new corporation) was engaged in the business of growing and purchasing tropical fruits in Central America and importing the same into the United States, through the Port of Mobile, and selling them throughout the United States, and in chartering and operating steamships between Panama and Mobile for that purpose. That, prior to the organization of the Camors-McConnell Company, the business conducted by it belonged to and was carried on by the copartnership known as Camors, McConnell & Co., composed of J. B. Camors and H. L. McConnell. That said copartnership had, prior to 1899, built up and was conducting a large and profitable business in the importation of tropical fruits from Colombia, through the Port of Mobile, and was widely known to the dealers in the United States and the planters in Central America, and had acquired an extensive good will. That their tangible assets did not exceed $30,000, but that their assets and good will was fully worth $50,000. That Preston, representing himself and associates, desired to purchase an interest in such partnership, and for that purpose entered into the written contract first hereinabove referred to. That this agreement was duly carried out, ratified, and approved by Camors, McConnell & Co.

That, pursuant to such agreement, the new corporation was, in the year 1899, organized under the name of "Camors-McConnell Company," in order to identify it in the public mind with said copartnership, whose business, property, and good will it was its purpose to exploit. That immediately after all the property, good will, and effects of said copartnership in said agreement described were transferred to it by said copartnership of Camors, McConnell, & Co., upon the terms specified and in the manner prescribed in said contract, and with the benefit of the provisions therein contained and hereinabove recited. That in payment therefor Camors-McConnell Company issue to the copartnership the number of shares of the capital stock agreed upon, and assumed and has since paid all the debts and obligations of said copartnership, as specified in the contract. That all of the obligations by said contract imposed upon complainants have been duly and completely performed, as by said contract required, and that said contract, as far as it relates to the provisions contained in the fifth article thereof, has always been held for the use, benefit, and protection of the Camors-McConnell Company. That the defendant was elected the president and general manager and a member of the board of directors of the Camors-McConnell Company, and occupied such position at a salary of $3,600 a year, until the 21st day of January, 1904, and still remains a member of the board of directors.

Defendant's position as president, general manager, and director gave him full opportunity to intimately acquaint himself with the business and affairs of the corporation, and of knowing all of the methods and secrets of its business and sources of profits, the names of its customers, the nature, scope, and duration of all of its contracts, and enabled him to enlarge his experience, knowledge, and skill in the conduct of the tropical fruit business, and that he took full advantage of these opportunities. That although the company has earned a profit every year since its organization, defendant, in violation of his contract, began some time in 1902 to secretly prepare to engage in business on his own account, or through a corporation to be controlled by him, in direct competition with the business of the Camors-McConnell Company. Without the knowledge of the other officers and directors, he acquired an alleged concession of the Republic of Colombia, which he claimed authorized him to improve rivers and harbors, and to acquire lands adjacent to the territory from which Camors-McConnell Company received its supplies of tropical fruits. That, at the expense of Camors-McConnell Company, he transported a party of surveyors and engineers to that country to lay out said lands and plan improvements of rivers and harbors to fit his property for the cultivation of bananas. That, at the expense of said company, he transported to Central America on ships of the company persons whom he was trying to induce to join him in such enterprise on inspection tours of said property. That, while

an officer of the Camors-McConnell Company, he took advantage of his access to the books and records of the company, and extracted therefrom the minutest details, facts, and figures, showing the results of its business, and printed and circulated the same among the public, to induce the public to join him in the organization of a corporation to engage in business in direct competition with the Camors-McConnell Company. That he surreptitiously made use of the funds, property. ships, and employés of the company in furtherance of said scheme, and also sold the better part of the loading plant at Bocas del Toro, consisting of steam launches, lighters, and boats, to persons whom he intended to have associated with him in the enterprise, or to have represent him in Panama as agents.

These facts coming to the knowledge of the company, it demanded of the defendant that he desist from the violation of the contract. but that he refused to do so, unless Camors-McConnell Company would take over the concession and lands upon unfair and oppressive conditions. That defendant organized a corporation styled the "American Banana Company," with a capital of $750,000, for the purpose of taking over and exploiting such concession and engaging in the business of importing bananas and other tropical fruits, and of operating steamships between Mobile and Panama, in competition with the business of Camors-McConnell Company. That he was elected president of the company, and will control and manage the business, in violation of said contract.

That the good will of Camors-McConnell Company was largely built up by the defendant, and its maintenance and enjoyment by Camors-McConnell Company depended on his not engaging in business in competition with it, and that the principal consideration of the purchase, at a large price, of the business and good will of said copartnership, was the covenant made by the defendant and others that they would not engage in a competitive business, and that such covenant was essential to secure to the Camors-McConnell Company the good will of their purchase, and that the business of Camors-McConnell Company extended throughout the greater portion of the United States, and said covenants were coextensive only with the interest transferred, and did not exceed in territory the extent of the business of said copartnership of Camors, McConnell & Co. That if defendant were permitted to be and remain an officer in the American Banana Company, or to direct the operations of it, the value of its good will and business purchased by the Camors-McConnell Company would be destroyed and great loss and damage inflicted upon complainants. That the complainants never consented to the defendant's engaging in such business, but protested against his doing so, and warned him that they would seek the enforcement of their rights under said contract. That, in so far as the provisions of the fifth article of the contract was concerned, they were made and have always been and still are held and exist for the use and protection of the Camors-McConnell Company, and that complainants both had a direct pecuniary interest in the enforcement of the contract.

On March 27, 1905, Andrew W. Preston obtained leave to dismiss the bill as far as concerned himself, without prejudice to himself. There were demurrers to the bill, but the action thereon need not be noted. The defendant answered. The answer admits many of the allegations of the bill, and denies others. The admissions are not material to a view of the case as it is considered by the court on this appeal, nor is it necessary to specify extendedly the denial. The answer does deny that Camors, McConnell & Co. had any good will of considerable magnitude, and explained the reasons therefor. He denied that said firm was, prior to the making of said agreement, doing a large and prosperous business, and showed that, on the contrary, owing to the active competition instituted by the United Fruit Company for the purpose of destroying their business, Camors, McConnell & Co. were not prosperous, but had sustained a continuous loss in their business, and that in October. 1899, said firm made an agreement with the United Fruit Company. the substance of which is set out in Exhibit A to the original bill, and in Exhibits I and II attached to the answer. The answer denies that Andrew W. Preston represented himself, and shows that he really represented the United Fruit Company, in making the contract sued upon. It admits that the United Fruit

Company, through Preston, desired to acquire a controlling interest in the business of Camors-McConnell Company, but denies that Preston individually desired to obtain any interest therein. It admits that the purpose of forming the new corporation was to combine the interest of several parties, but denies its purpose was to provide for the safe and proper management of the business. and shows that the real purpose of the corporation was to suppress the existing competition in the business of growing, importing, and selling tropical fruits, and to enable the United Fruit Company and others to monopolize and control said business of purchasing and importing tropical fruit and selling it in the several states of the United States, and to fix the quantity of such importation and the prices at which fruit should be sold. That the new corporation was formed so that the United Fruit Company, as a holder of a majority of the stock of said corporation, might control and dominate said business in harmony with said purpose. The answer denies that the contract was carried out as made, and shows that, when the Camors-McConnell Company was incorporated, it, on the 27th day of January, 1900, entered into an agreement directly between said corporation and the firm of Camors, McConnell & Co. for the purchase and transfer to said corporation of the property and business of said copartnership, and that the corporation purchased said property and business under said last-named contract, without reference to the provisions of the contract of December 8, 1899, and that the provisions of paragraph 5 of Exhibit A to the bill were wholly omitted from such agreement.

The answer further alleges as follows:

"Further answering the fourth paragraph of the bill of complaint, defendant shows to the court that the formation of said corporation and the sale of the business and property of Camors, McConnell & Co. arose and was brought about in this way: Prior to the year 1899, the entire business in the importation and sale of tropical fruit in the United States was conducted by a comparatively small number of firms and companies. The tropical fruit was obtained by the importers from the West Indies, Central and South America, by them imported into the United States, and sold in many of the states of the United States. There were probably less than 15 individuals, firms, and corporations engaged in importing into the United States fruits from the West Indies, and most of this fruit was sold in the Eastern states of the United States. There were less than a dozen individuals, firms, and corporations engaged in importing fruit from Central and South America. The fruit which was being imported from Central America and South America was principally sold in the Southern, Western and Middle states, and those handling said business had comparatively small capitals. The names of said several companies, to the best of defendant's information, knowledge, and belief, and upon such information, knowledge, and belief, he states to have been as follows, viz. [Here both of these classes are named.]

"The method of conducting this business was to obtain cargoes from places where fruit was raised, partly from plantations belonging to those engaged in importing, but largely by purchasing the fruit from persons resident at the point where the fruit was grown, import the same into the United States, and sell and ship it to various states in the United States. Much of the fruit was sold free on board of cars at the place of deportation, but some was shipped to other states and sold while in transit, and sometimes after it reached its destination. There was great competition between the several parties engaged in the purchase of said fruit, and they were obliged, on account of such competition, to pay fair and reasonable prices for the same. There was no limitation upon the quantity of fruit that each importer should handle, and the quantity of fruit placed upon the market and the natural competition in its sale controlled the prices at which the fruit sold upon the market.

"In 1899, the United Fruit Company was formed, with a capital of $20,-000,000, of which at least $11,000,000 was actually subscribed, and which subscriptions were subsequently increased to $15,784,000, and the means of said company were increased by the issue of mortgage bonds to the extent of $40,500,000; but this indebtedness has since decreased to some extent. The purpose of said company was to purchase the properties and business of other

fruit importing companies, individuals, and copartnerships, or to make such arrangements with them that would enable it to monopolize, as far as possible, the business of importing tropical fruit into the United States and selling such fruit throughout the several states of the United States; to control and regulate the prices at which cargoes of bananas could be obtained at points of shipment; and at which the same should be sold and disposed of throughout the United States; to regulate and restrict the quantity of tropical fruit placed upon the markets of the several states of the United States; to prevent competition in the purchase and sale of such fruit; and to reduce the price paid for fruit and increase the price at which same should be sold. Shortly after said corporation was formed, it entered into negotiations with the larger portions of persons, corporations, and copartnerships engaged in said business, with the view of forming such a combination or trust, and eventually succeeded in purchasing or making arrangements for the conduct of the business of numerous companies and individuals, and, as part of the agreement of purchase of each of such persons, it bound and obligated most all persons interested therein not to again enter into business in competition with the said United Fruit Company for various periods.

"Before making any arrangement or combination with Camors, McConnell & Co., the said United Fruit Company entered into active competition with said company, and for the purpose of destroying said business purchased fruits at the points where Camors, McConnell & Co. obtained their cargoes, at large prices, thereby forcing Camors, McConnell & Co. to obtain fruit at prices in excess of those at which they could profitably dispose of the same. After continuing this competition for some considerable time, and causing Camors, McConnell & Co. to lose large sums of money, the United Fruit Company, or persons representing it, entered into negotiations with the copartners composing Camors, McConnell & Co., with a view of forming a combination with it upon such terms as would limit the amount of fruit imported by said firm and prevent competition by it with the United Fruit Company and its combined associates, both in the purchase and sale of fruit. For the purpose of regulating the sale of fruit in the several states of the United States so as to prevent such competition, the United Fruit Company had caused to be organized a corporation, with the nominal capital stock of $10.000, known as the 'Fruit Dispatch Company,' all, or substantially all, of the stock of which was owned by the United Fruit Company, and which was wholly dominated and controlled by it. After negotiating and agreeing with the representatives of the United Fruit Company as to a method by which such combination should be formed to restrict the quantity of fruit imported, and regulate prices in the purchase and sale of fruit, it was agreed that a corporation should be formed to take over the business and property of Camors, McConnell & Co., with a capital stock of $60,125.00, divided into 481 shares, of the par value of $125 each. That said corporation was to take over the business and property of Camors, McConnell & Co., and was to turn over to said company 321 shares of the capital stock of said corporation in payment therefor, of which said 321 shares the United Fruit Company should purchase 161 shares for the sum of $30,000, and that the United Fruit Company should then subscribe for 80 shares of the unissued capital stock of the new corporation, and Camors, McConnell & Co. should subscribe for 80 additional shares of said stock, and that each should pay $10,000 therefor. That the new corporation should import from Bocas del Toro, Colombia, into the United States, such amounts of bananas, cocoanuts, and other tropical fruits as could be carried in two steamers, each of the carrying capacity of about 20,000 or 22,000 bunches of bananas, or, at their option, in three steamers of no greater aggregate carrying capacity, and that the United Fruit Company would not, without the consent of a majority interest of stockholders of the Camors-McConnell Company, who were originally interested in the firm of Camors, McConnell & Co., send any bunches of bananas through northern ports containing less than seven hands into any markets reached by the fruit of the Camors-McConnell Company, and that further restrictions on the importation of fruits might be made upon a pro rata basis to be mutually agreed upon by the United Fruit Company, the Bluefields Steamship Company, Limited, the Camors-Weinberger Banana Company, Limited, Orr-Laubenheimer Company,

and Camors-McConnell Company; and that, when such restrictions were agreed upon, they should be binding, and should be respected. That rules of classification and prices of fruits at the ports of shipment should be mutually agreed upon by the resident managers of the United Fruit Company and the Camors-McConnell Company, and that such classification should govern, as far as possible, any sale of the same fruit. That uniform rates of freight should be agreed upon by the United Fruit Company and the Camors-McConnell Company to apply to all steamers of the said two companies plying between the same or competitive points, excepting then existing contracts, which should be filed by the parties by the delivery of sworn copies of the original in each case to the other company, and said contract was to remain in force for a period of 10 years.

"It was further agreed that the Camors-McConnell Company should appoint the Fruit Dispatch Company its sole and exclusive agent, to sell all fruit imported by the Camors-McConnell Company from Bocas del Toro in Colombia, or elsewhere, to New Orleans, in Louisiana, or Mobile, Alabama, or elsewhere; the prices to be fixed weekly by four persons selected by the United Fruit Company, the Bluefields Steamship Company, Limited; the Orr-Laubenheimer Company, the Camors-Weinberger Company, Limited, and the Camors-McConnell Company. That the fruit of the Camors-McConnell Company should be sold to the best advantage free on board of cars at New Orleans or Mobile, or other ports of entry, under the direction of two competent persons, selected one by the United Fruit Company and one by the manager of the Camors-McConnell Company, and that all the fruit not so sold should be shipped or consigned by the Dispatch Company for sale for account of said Camors-McConnell Company, to such points as such persons should designate. That that contract was to remain in force for 10 years.

"The said United Fruit Company undertook to have said contract reduced to writing. Exhibit A to the bill of complaint was one of the forms of contract so prepared and presented to those interested in the firm of Camors, McConnell & Co. As so prepared and presented, the name of Andrew W. Preston appeared instead of the United Fruit Company therein, but all of the parties to said transaction always recognized the United Fruit Company as the true party in interest; and although stock in the Camors-McConnell Company was, after that company was formed, issued to said Preston, dividends thereon were paid to the United Fruit Company as the owner of said stock. There were a considerable number of dividends so paid, and, although the said Preston was the president of the United Fruit Company, he never questioned its right to use these dividends, or objected to the payment thereof to it. The United Fruit Company had the remaining terms of said contract reduced to writing in the form of two separate contracts, which were presented and executed by the parties whose names appear thereto, and which two contracts are marked Exhibits I and II to this answer and made part hereof.

"Further answering the bill of complaint, this defendant says that the said Camors-McConnell Company and the United Fruit Company are conducting their business in a manner violative of the laws of the United States; that at the time said contract, made Exhibit A to the bill of complaint, was made and entered into, the purpose of making said contract was to aid and facilitate the said United Fruit Company and the said Camors-McConnell Company and the other companies in combination with them in conducting their business in violation of the laws of the United States; that said contract was made in restraint of trade and commerce among the several states and with foreign nations, and for the purpose of forming and maintaining a combination in the form of a trust, to regulate and to limit the supply of tropical fruit imported into the United States and control the prices at which such fruit should be purchased from growers and at which it should be sold to dealers throughout the United States, and generally to monopolize and control said business; and that for said reason said contract is against public policy, and in violation of law, and is null and void.

"Further answering the bill of complaint, this defendant says that after the several agreements, one of which is made Exhibit A to the bill of complaint, and the other three of which are made Exhibits I and II and III to this

answer, were made and entered into, and after the United Fruit Company had bought out the property and business of a large number of competitors in the importation and sale of tropical fruits in the Central, Southern, and Western states, and bound most of the parties making such sales not to compete with them in the business, by agreements similar to the one made Exhibit A to the bill of complaint, and had made agreements similar to those attached to this answer as Exhibits I and II, with several other corporations and parties engaged in said business, and it and said corporations and parties, with whom it had such agreements, under such agreements fixed and regulated the price at which tropical fruits were purchased at the point of shipment, and sold and disposed of all of the fruits so imported by it and them through the Fruit Dispatch Company in such manner as to, to a large extent, fix and control the price at which tropical fruit was sold throughout the United States; that, out of the commissions paid to the Fruit Dispatch Company, the expenses of that company were paid, and the balance of its earnings were distributed pro rata among the several companies whose fruit it handled. By virtue of said several agreements and combinations, the United Fruit Company and its associations not only fixed and regulated the prices at which tropical fruits were purchased and sold, but monopolized almost the entire business in the Southern, Central, and Western states of the United States, and regulated the prices of tropical fruits therein, and, when necessary to do so in order to control and fix such prices, the said Fruit Dispatch Company, under the control and direction of the said United Fruit Company, caused a great deal of fruit to be destroyed."

Exhibits I and II are as follows:

### Exhibit I.

"An agreement by and between the United Fruit Company, incorporated under the laws of New Jersey, of the one part, and J. B. Camors, Herbert L. McConnell, Rudolf Braden and Louis Weinberger (herein called stockholders) of the other part.

"Whereas, the stockholders are the holders of all the capital stock of the Camors-McConnell Company (herein called the Camors Company), which is engaged in the business of growing, transporting and selling tropical fruit, and the United Fruit Company is also largely engaged in similar business: Now, therefore, in consideration of the premises and of the mutual agreement hereof, it is hereby agreed as follows:

"(1) The United Fruit Company agrees that the Camors Company may import from Bocas del Toro, Colombia, into the United States, such amounts of bananas, cocoanuts and other tropical fruit as can be carried in two steamers, each of the carrying capacity of about twenty or twenty-two thousand bunches of bananas, or at the option of the Camors Company, in three steamers of no greater aggregate carrying capacity than that of the said two steamers above provided for, and that of the said two steamers above provided for, and which the Camors Company shall be entitled to substitute for such two larger steamers, and the said United Fruit Company agrees that after it has completed its own cargoes to an aggregate amount of not exceeding one hundred and twenty thousand stems per month of four weeks for its own ships operated by it to Bocas del Toro, it will furnish bananas of good average quality and quantity sufficient to complete the cargoes of and fill the steamers of the said Camors Company above described, at prices to be agreed upon between the resident managers of the United Fruit Company and the said Camors Company, but the same not to exceed twenty-five cents in the United States currency per bunch of firsts delivered alongside the steamer. It is further agreed that the said resident manager of the Camors Company shall be such person as the stockholders above named or the owners of a majority of their stock in said Camors Company shall designate so long as he performs his duties and obeys the mandates of the board of directors.

"(2) The United Fruit Company agrees that it will not, without the consent of a majority of interest of the above named stockholders, send any bunches of bananas through the northern ports containing less than seven hands into

any of the markets reached by the fruit of the Camors Company. Further restrictions on imports to southern ports may be made upon a proportionate basis mutually agreed upon by the following importers, namely, the United Fruit Company, the Bluefields Steamship Company, Limited; Camors-Weinberger Company, Limited, Orr-Laubenheimer Company, Limited, and the Camors-McConnell Company, and when so made shall be binding and respected. And the amounts of imports above prescribed may be increased proportionately for the said United Fruit Company and the Camors-McConnell Company, upon consent of the United Fruit Company and the majority of the above named stockholders, who hold the shares of stock which are retained by the Camors-McConnell Company pursuant to the contract.

"(3) Rules for the classification and prices of the fruit at port of shipment shall be mutually agreed upon by resident managers of the United Fruit Company and the Camors Company and the same classification shall govern so far as possible in the sale of the same fruit.

"(4) Uniform rates for freight and the carriage of passengers shall be agreed upon by the United Fruit Company and the Camors Company to apply to all steamers of the said two companies plying between the same or competitive points, excepting from the operation hereof such present existing contracts as shall be filed by the contracting parties by delivering a sworn copy of the original in each case to the other of the last said companies respectively.

"(5) This contract shall remain in force for ten years from this date, unless sooner modified by the consent of parties.

"In witness whereof the United Fruit Company has caused these presents to be executed in its name and behalf by its duly authorized officers and the said stockholders have hereto set their hands and seals, this 8th day of December, 1899.

"United Fruit Company,
    "Minor C. Keith, 1st Vice President,
    "By B. W. Palmer, Secretary.
"H. L. McConnell.
"Louis Weinberger.
"Rudolf Braden."

Exhibit II.

"An agreement made by and between the Fruit Dispatch Company, incorporated under the laws of New Jersey, of the one part, and the Camors-McConnell Company incorporated under the laws of New Jersey (hereinafter called the Camors Company), of the other part.

"Whereas, the Camors Company is engaged in growing, importing into the United States and selling tropical fruit, and the Fruit Dispatch Company is formed for the purpose of and is engaged in handling and selling such fruit: Now, therefore, in consideration of the premises and of the mutual agreements herein contained, it is hereby agreed and declared as follows:

"(1) The Camors Company hereby appoints the Fruit Dispatch Company its sole and exclusive agent to sell all fruit imported by the Camors Company imported from Bocas del Toro or elsewhere, to New Orleans, in Louisiana, or Mobile, in Alabama, or elsewhere.

"(2) All fruit of the Camors Company shall be sold to best advantage free on board cars at New Orleans or Mobile or other port of entry under the direction of two competent persons, one selected by the manager of the Camors Company (whose services shall be paid for by the Fruit Dispatch Company at such amount as the Camors Company and the Fruit Dispatch Company shall agree), and all fruit so unsold by them shall be shipped or consigned by said Dispatch Company for sale for account of said Camors Company to such points as said two persons shall designate, to be handled as they may direct.

"(3) Payments for the fruit sold by or through the Fruit Dispatch Company shall be made during each calendar week for all sales completed during the preceding calendar week. The Fruit Dispatch Company shall charge five per cent. on the selling price for all fruit sold by it.

"(4) This contract shall remain in force until December 8, 1909, unless sooner modified by the consent of the parties.

"In witness whereof the parties have caused these presents to be signed by their respective officers thereto duly authorized, this 27th day of January, 1900.

"Fruit Dispatch Company,
"By A. W. Preston, President.
"Camors-McConnell,
"By A. W. Palmer, President.

"Attest:   Frank Hendrick, Secty."

The complainant excepted to ...e several portions of the answer hereinabove set out between quotation marks, as irrelevant, immaterial, and impertinent to the issue. The court referred the matter to a master, and he sustained the exceptions. The defendant excepted to the master's report, but these exceptions were overruled, and the action of the court in overruling the exceptions is assigned as error. Evidence was taken, and the case came on for final hearing, which resulted in the decree appealed from, perpetually enjoining the defendant from engaging in business in competition with the business of complainant for and until it has failed to show a profit for any calendar year after the year 1899.

Gregory L. Smith and H. T. Smith, for appellant.
Walker B. Spencer and Chas. P. Cocke, for appellee.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

McCORMICK, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The question in this case which we deem it necessary to consider is: Was the contract between the parties void because made for the purpose of forming an illegal trust or combination? It is uniformly conceded that such a defense as this is a very dishonest one, and that it lies ill in the mouth of the defendant to allege it, and that it is only allowed for public considerations and in order the better to secure the public against dishonest transactions. But that to refuse to grant either party to an illegal contract judicial aid for the enforcement of his alleged rights under it tends strongly toward reducing the number of such transactions to a minimum; that the more plainly parties understand that, when they enter into contracts of this nature, they place themselves outside the protection of the law, so far as that protection consists in aiding them to enforce such contracts, the less inclined will they be to enter into them, and in that way the public will secure the benefit of a rigid adherence to the law.

If the writing relied upon by the complainant is only a portion of the agreement that had been made between these parties, as the answer plainly alleges, although their agreement, in the first instance, was by parol, and only certain portions of it were subsequently reduced to writing, as averred and exhibited by that portion of the answer which was stricken out, the whole contract is none the less one and indivisible, just as though it had all been put in writing. If it had all been reduced to writing, the very learned counsel for the complainant would scarcely have argued that his client might maintain an action by relying on that part of the contract which he claimed was valid, and might discard or omit to prove that portion which was illegal. If the contract be as averred in the answer, and the complainant do not prove

the whole of it, the defendant could prove it, as well the part lying in parol as that which was reduced to writing, so that the court might, upon an inspection of the whole contract, determine therefrom its character. The unity of the contract is not severed, or its meaning or effect in any degree altered, by putting part of it in writing and leaving the rest in parol. It would seem, therefore, that, in such case, to grant the complainant the relief which it here seeks would be, in substance, to enforce an illegal contract and one which is illegal because it is against public policy to permit it to stand.

What we have thus far presented is adopted almost literally from the opinion of Mr. Justice Peckham in McMullen v. Hoffman, 171 U. S. 649, 19 Sup. Ct. 839, 43 L. Ed. 1117. That learned justice had delivered the opinion of the Supreme Court in the cases of United States v. Freight Association, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007, and United States v. Joint Traffic Association, 171 U. S. 505, 19 Sup. Ct. 25, 43 L. Ed. 259, and he was later the organ of the court in the case of Addyston Pipe & Steel Company v. United States, 175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136, and in Montague & Company v. Lowry, 193 U. S. 38, 24 Sup. Ct. 307, 48 L. Ed. 608. In each of the cases cited, but especially in the Joint Traffic Association Case, all of the contentions which have been urged on this question in this case were exhaustively considered, and, we think, were concluded against the contention of the complainant (appellee).

Soon after the passage of the act of July 5, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200], the questions here involved were considered by the Circuit Court in this circuit for the Eastern district of Louisiana, Judges Pardee and Billings sitting at the hearing, on an application for equitable relief very similar to the relief sought in this case. We quote, from the syllabus, the following language:

"Defendant and his partner sold their bakery business to complainant corporation, receiving payment in its stock, and defendant leased to it the premises where the business was conducted, and contracted to carry it on as the purchaser's agent for a salary. After operating under this arrangement for a time, he repudiated the sale, resumed business under the old firm name, and refused to account to complainant. The bill was brought to enjoin him from asserting a hostile claim, for an accounting, and a receiver. Defendant and his partner, as intervener, filed a cross-bill for rescission of the sale, for fraudulent representations, and tendered back the stock. Complainant was practically a 'trust,' organized to monopolize the business, and had already control of 35 leading bakeries in 12 different states. Held, that while a case was made for a receiver, pending litigation between ordinary parties, the prayer would be denied, as equity would not encourage a combination in restraint of trade, and probably illegal, under Act Cong. July 2, 1890, 'to protect trade and commerce against unlawful restraints and monopolies.'" American Biscuit & Manufacturing Company v. Klotz (C. C.) 44 Fed. 721.

It is contended for the complainant (appellee) that, if such iniquity exists in the organization of that company as is averred by the answer, the remedy is by direct proceeding by the state to dissolve it, or to punish the guilty parties. In answer to this contention, we commend the parties who make it to a fuller and more unbiased study of the reported decisions we have cited. It is also urged that the United Fruit Company is not a party to this proceeding, and that therefore the matter averred may not be considered in the disposition of this suit. We do

not so read the pleadings. The bill was supplemented by the answer. It is the function of the chancellor to look through the form to the substance of the matter in which he is asked to act. Moreover, this suggestion, by a short analysis of its probable practical working, resolves itself into the former contention which, as we have indicated, we consider to be settled against the complainant (appellee) by the decisions which we have cited.

The averments of the answer show that the United Fruit Company has combined and dominates substantially all of the other persons, individuals, firms, or corporations engaged in the trade of importing tropical fruits from Central and South America and the Antilles; that there are 25 or more constituent agencies in this combine to monopolize the procuring by production and purchase, and the carriage and distribution to consumers, of these articles in universal use. The United Fruit Company, which dominates all of them, may act only through some one or more of them in its dealings with the public or outsiders. If, therefore, the so-called separate contracts of these numerous constituent agencies can and must be enforced by our courts of law and equity, the public policy of the country which it is so important to protect may indeed be enforced only through the action of the state as a party to a direct proceeding.

The cardinal principles of jurisprudence are as firmly settled as the Ten Commandments and the Roman Tables, but pleading, practice, and procedure must grow with the growth of civilization and commerce. The present and threatened development of producing, carrying, and trading corporations transcends recorded precedents. Their number, dimensions, and omniverous character have, in large measure, absorbed or devoured individual natural persons having capacity and inclinations for trade, until an action at law or suit in equity is rarely reported which does not show a contest between corporations or by or against a corporation or system of corporations. These unnatural persons, as they may well be called, when legally organized, and while conducting lawful trade in a lawful manner, have the right to judicial protection and relief, in like measure as natural persons enjoy, and are subject to the same legal and equitable limitations. The state may and will bring, in its courts, actions and suits to enforce its statute laws and its public policy against them, when necessity requires, to the extent that time and opportunity permit. But the harvest is great, the laborers are few, and time is short. These parties are wonderfully strong. Age does not impair their strength. They perennially recruit it from the highest ranks of the legal profession, with veteran experts in strategy and tactics, both grand and elementary. There are necessary delays in litigation, inherent weaknesses in its best machinery, obstructions will supervene, and all these elements are capitalized to the last extent of their earning capacity, by these highly organized unnatural persons, who decide and act with the promptness and prescience of the most superior human intellect. Direct proceedings by the state are overtaxed. The courts, especially the courts of equity, should not pose always as the fabled goddess, but keep an eye single to these exigent conditions and aid the state, as they rightly may, by withholding help or grace from graceless and hurtful dealings.

Other decisions of the Supreme Court than the leading cases we have cited furnish good reasons for, and illustrations of, the application of the doctrine now deduced from the recent statutes and the ancient common law. Northern Securities Co. v. United States, 193 U. S. 197, 24 Sup. Ct. 436, 48 L. Ed. 679; Swift & Co. v. United States, 196 U. S. 375, 25 Sup. Ct. 276, 49 L. Ed. 518. A recent case reported from the Circuit Court of Appeals for the Sixth Circuit treats the question we are considering with great ability, and gives the result of the decisions of the Supreme Court with a clearness and force most persuasive to us. Continental Wall Paper Co. v. Voight & Sons Co. (C. C. A.) 148 Fed. 939.

We conclude that the lower court erred in sustaining the exceptions to the defendant's answer; that the decree appealed from must be reversed, and the cause remanded to the Circuit Court, with direction to overrule the exceptions, and thereafter to proceed agreeably to equity and the views expressed in this opinion.

And it is so ordered.

## On Rehearing.

PER CURIAM. The application for a rehearing is denied. The scope and effect of the decree of reversal is to reinstate the parts of the answer which were stricken out by the circuit court. The record shows exactly the words of the answer, so that the decree cannot be misunderstood.