## GIBBS, ATTORNEY GENERAL, ET AL. v. BUCK ET AL.

No. 276. Argued January 10, 1939.—Decided April 17, 1939.

*Messrs. Tyrus A. Norwood,* Assistant Attorney General of Florida, and *Lucien H. Boggs,* with whom *Messrs. George Couper Gibbs,* Attorney General, and *Andrew W. Bennett* were on the brief, for appellants.

*Mr. Thomas G. Haight,* with whom *Messrs. Frank J. Wideman, Louis D. Frohlich, Herman Finkelstein,* and *Manley P. Caldwell* were on the brief, for appellees.

MR. JUSTICE REED delivered the opinion of the Court.

This is an appeal from the order of a three-judge court refusing to dismiss a bill of complaint on motion for failure to set out facts sufficient to show federal or equity jurisdiction, or to constitute a cause of action, and granting an interlocutory injunction against the enforcement of a Florida statute aimed at combinations fixing the price for the privilege of rendering privately or publicly for profit copyrighted musical compositions. § 266, Jud. Code.

The appellant, the state Attorney General and various State Attorneys, are officers of the State of Florida charged with the enforcement of the act. The appellees, complainants below, are the American Society of Composers, Authors and Publishers, an unincorporated association organized under the laws of the State of New York; Gene Buck as president of the Society; various corporations publishing musical compositions; a number of authors and composers of copyrighted music; and several next of kin of deceased composers and authors. This suit was brought by complainants on behalf of themselves and others similarly situated, members of the Society, too numerous to make it practicable to join them as plaintiffs in a matter of common and general interest.[1]

One of the rights given by the Copyright Act is the exclusive right to perform copyrighted musical compositions in public for profit.[2] The bill of complaint alleges that users of musical compositions had refused to recog-

[1] Equity Rule 38.

[2] Act of March 4, 1909, § 1 (e), c. 320, 35 Stat. 1075, 17 U. S. C. § 1 (e).

nize this statutory right and to pay royalties for public performances for profit, and that authors, composers and publishers were unable, individually, to enforce their exclusive right because of the expense of detecting and suing for infringement throughout the United States. The Society was founded in 1914 to license performance of copyrighted music for profit and otherwise protect the copyrights. The state statute was directed at organizations like the Society and became effective on June 9, 1937.[3] So far as is important here, the statute makes it unlawful for owners of copyrighted musical compositions to combine into any corporation, association or other entity to fix license fees "for any use or rendition of copyrighted vocal or instrumental musical compositions for private or public performance for profit," when the members of the combination constitute "a substantial number of the persons, firms or corporations within the United States" owning musical copyrights. It declares the combination an unlawful monopoly, the price-fixing in restraint of trade, and the collection of license fees and all contracts by the combination illegal.

The bill attacked the statute as contrary to the Constitution and laws of the United States and the constitution of Florida. More specifically, it urged that the law impinged upon rights given by the Copyright Act of 1909, deprived complainants of rights without due process of law and without the equal protection of the laws, impaired the obligation of contracts already executed, and operated as an ex post facto law.

There was a formal allegation that the matter in controversy exceeded $3,000, exclusive of interest and costs. In addition, the bill alleged that the three publishers owned copyrights of a value in excess of $1,000,000 while each of the individual complainants owned copyrights

---

[3] Fla. Gen. Laws 1937, Vol. I, c. 17807.

worth in excess of $100,000; that it would cost each individual more than $10,000 to create an agency in Florida to protect himself against infringement by unauthorized public performances for profit, to issue licenses and to check on the accuracy of uses reported; that fees collected in 1936 in Florida amounted to $59,306.81 and that similar sums were expected in the future; and that in 1936 each of the three publishers received more than $50,000 from the Society and each individual more than $5,000.

A motion for a temporary injunction was made on February 7, 1938, the same day the bill was filed. Voluminous affidavits were presented in support of the motion. They tend to substantiate the allegations of the complaint on the value of the copyrights and the income from the Society. Each publisher deposed that it had received more than $50,000 from the Society in 1936, that its contract with the Society had a value in excess of $200,000, and that to fix prices on each composition for each use in Florida would require an expenditure of more than $25,000. The affidavits of the individuals showed annual incomes to them from the Society of from $3,000 to $9,000; contracts with the Society which the affiants valued in the thousands of dollars and an expense, in one instance, as high as $5,000 to comply with the requirements of the Florida statute.

On March 3, 1938, the appellants moved to dismiss on several grounds: (1) absence of jurisdictional amount; (2) failure to state a cause of action; (3) want of equity and other objections not strongly pressed at this time.

The district court granted an interlocutory injunction and denied the motion to dismiss the bill. It thought that great damage would result unless the injunction issued and that there was grave doubt of the constitutionality of the act. Its findings of fact and conclusions of law were filed about a month and a half after the

per curiam decision. It found that "the matter in controversy exceeds $3,000 exclusive of interest and costs."

*Federal Jurisdiction.*—The issue was raised in the lower court by a motion to dismiss on the ground that it affirmatively appears "from the allegations of the bill . . . that the jurisdictional amount of $3,000.00 . . . is not involved . . . in that it appears that the suit is brought for the benefit of the members of the American Society of Composers, Authors and Publishers . . . and it does not affirmatively appear that the loss of any member of said society due to the enforcement of [the challenged act] would amount to the . . . necessary jurisdictional amount." Other jurisdictional averments of the motion state that the Society cannot suffer any loss from the legislation because it affirmatively appears that the Society divides all its proceeds from licensing between its members and affiliates and "therefore, the loss, if any, sustained due to the enforcement of said Florida laws would fall on the members of the Society, and not on the Society itself." Finally the motion sets out the lack of jurisdiction because it affirmatively appears from the allegations of the bill that the jurisdictional amount is not involved "because the plaintiffs have not shown the extent of loss or damage they would suffer by reason of the enforcement of said State law, as compared with the amount of profit they would make by the non-enforcement of said law." As the form of the motion on the jurisdiction admitted the bill's statements, it was submitted on the allegations without the production of any evidence.

This method of testing the jurisdiction properly raises the question. No issue is made as to the standing of the Society or its members to sue. The basis of the attack is that there is a lack of the essential allegations as to the value of the matter in controversy. As there is no statutory direction for procedure upon an issue of ju-

risdiction, the mode of its determination is left to the trial court.[4] Both complainants and defendants were content to rest upon the bill and motion.

The bill alleges that the value of the matter in dispute exceeds the jurisdictional amount. Such a general allegation when not traversed is sufficient, unless it is qualified by others which so detract from it that the court must dismiss *sua sponte* or on defendants' motion.[5] In this instance, the allegation is, in effect, traversed by the language of the motion which asserts that no plaintiff has shown loss from enforcement equal to the jurisdictional amount. No other allegations are denied. By this method of attack the facts set out in the bill are left unchallenged for the court to accept as true without further proof. The burden of showing by the admitted facts that the federal court has jurisdiction rests upon the complainants. If there were any doubt of the good faith of the allegations, the court might have called for their justification by evidence.[6] In view of the unchallenged facts, federal jurisdiction will be adequately established, if it appears that for any member, who is a party, the matter in controversy is of the value of the jurisdictional amount,[7] or, if to the aggregate of all the members in this representative suit, the matter in controversy is of that value.

This Society, an unincorporated association with a membership of more than a thousand of the leading authors, composers and publishers of music, has received by assignment and possesses, for a five-year period which covers the time here involved, the "exclusive right to

---

[4] *Wetmore* v. *Rymer*, 169 U. S. 115, 120, 121; *McNutt* v. *General Motors Acceptance Corp.*, 298 U. S. 178, 184; *KVOS, Inc.* v. *Associated Press*, 299 U. S. 269, 278.

[5] *KVOS, Inc.* v. *Associated Press*, 299 U. S. 269, 277; *McNutt* v. *General Motors Acceptance Corp.*, 298 U. S. 178, 189.

[6] *McNutt* v. *General Motors Acceptance Corp.*, 298 U. S. 178, 189.

[7] *Grosjean* v. *American Press Co.*, 297 U. S. 233, 241–242. *Clark* v. *Paul Gray, Inc.*, 306 U. S. 583.

publicly perform for profit" musical compositions owned by its members. Licenses are issued by the Society to users in Florida "for the public performance for profit" of these compositions. After payment of expenses and royalties for similar rights to foreign associates, and retention of certain reserves, the receipts from licenses are divided among the members in amounts and by classifications fixed by the articles of association and the Board of Directors. The Society undertakes to protect itself and its members from piracies of the rights assigned to it. The Society has, in the absence of the challenged legislation and without now giving consideration to other objections as to the legality of its organization, a right to license which may be injuriously affected by the Florida statute. Whether this right to license flows from its limited ownership of the copyrights or by authority of its members is immaterial here. We find it unnecessary to decide whether this unincorporated association has standing to sue and confine our decision to the amount in controversy between the members of the Society and the defendants. Members, both corporate copyright owners and individual composers of music and lyrics, are plaintiffs. They represent all other members. As the members own the copyrights, less the limited assignment to the Society of the right of public performance for profit, and share in the earnings through mandatory distribution under the articles of association and not by way of dividends, they are proper parties to the action.[8] These members are real

---

[8] Article XV, § 1, of the articles of association, reads as follows: "Apportionment of Royalties—

"Section 1. All royalties and license fees collected by the Society shall be from time to time as ordered by the Board of Directors distributed among its members, provided, however:

"(a) That all expenses of operation of the Society and sums payable to foreign affiliated Societies shall be deducted therefrom and duly paid; and

"(b) That the Board of Directors, by two-thirds vote of those present at any regular meeting may add to the Reserve Fund

parties in interest. Because of the interposition of the statute they cannot in combination license production and collect fees in Florida. Unless the relief sought, the invalidation of the statute, is obtained, the members cannot conduct their business through the medium of the Society. They have a common and undivided interest in the matter in controversy in this class suit.[9]

The essential matter in controversy here is the right of the members, in association through the Society, to conduct the business of licensing the public performance for profit of their copyrights. This method of combining for contracts is interdicted by the Florida statute. It is not a question of taxation or regulation but prohibition. Under such circumstances, the issue on jurisdiction is the value of this right to conduct the business free of the prohibition of the statute.[10] To determine the value of this right the District Court had the admitted facts that more than three hundred contracts expiring in 1940 were in existence between the Society and the Florida users; that in 1936 alone almost sixty thousand dollars was collected from the users, and that similar sums were expected for the remainder of the term. While the net profit of the business in Florida is not shown, the business of the Society, as a whole, is profitable. The three publisher parties receive more than $150,000 yearly and

---

any portion not exceeding 10% of the total amount available for distribution; and

"(c) That the net amount remaining after such deduction for distribution shall be apportioned as follows: one-half (½) thereof to be distributed among the 'Music Publisher' members, and one-half (½) among the 'Composer and Author' members respectively."

[9] Cf. *Troy Bank* v. *Whitehead & Co.*, 222 U. S. 39; *Shields* v. *Thomas*, 17 How. 3.

[10] *Scott* v. *Donald*, 165 U. S. 107, 114; cf. *Hunt* v. *New York Cotton Exchange*, 205 U. S. 322, 334; *McNeil* v. *Southern Ry. Co.*, 202 U. S. 543; *Bitterman* v. *Louisville & N. R. Co.*, 207 U. S. 205; *Packard* v. *Banton*, 264 U. S. 140.

individuals more than $5,000 per year each. The cost of compliance with its requirements is evidence also of the value of the right of freedom from the act.[11] The complainants, other than the Society, allege without traverse that the cost to each one of providing individually in Florida the services now provided by the Society for each member would exceed $10,000. Whether this is annually, for the length of the agreement or for some other term is not shown. From these facts, the finding of the District Court that the matter in controversy—the value of the aggregate rights of all members to conduct their business through the Society—exceeds $3,000 in value is fully supported.

*McNutt* v. *General Motors Acceptance Corp.*[12] differs. There the State of Indiana had passed an act regulating, not prohibiting, the business of the Acceptance Corporation. The right for which protection was sought was the right to be free of regulation. It was to be measured by the loss, if any, following enforcement of regulation. This was not alleged or proved. In *KVOS, Inc.* v. *Associated Press*,[13] relief was sought to enjoin alleged pirating, by radio, of news furnished by the Associated Press to its members. The right for which protection was sought was "the right to conduct those enterprises free of" interference. On the issue of the value of this right, it was deposed only that the Associated Press received more than $8,000 per month for news in the territory served by the broadcasting station and was in danger of losing the payments. The Associated Press was a nonprofit corporation, operated without the purpose of profiting from its services to members and equitably dividing the expenses

[11] *Packard* v. *Banton,* 264 U. S. 140; *Petroleum Exploration, Inc.* v. *Public Service Comm'n,* 304 U. S. 209, 215; *Healy* v. *Ratta,* 292 U. S. 263; *Buck* v. *Gallagher, post* p. 95.

[12] 298 U. S. 178.

[13] 299 U. S. 269.

among them. The damage in the *Associated Press* case was to its members and this was not shown. Neither was it alleged or proved that any member threatened to withdraw or to reduce its payments.

*Failure to State a Cause of Action.*—The motion to dismiss also presents generally the issue whether the bill states facts sufficient to constitute a cause of action. By the submission of the motion this issue was left to the Court on the facts alleged in the bill. The elaboration of these facts, contained in the affidavits supporting and objecting to the motion for temporary injunction, is not available for consideration, as these affidavits are a part of the record only for the purpose of determining the propriety of a temporary injunction.[14] Whether to grant or refuse a motion to dismiss before answer, is largely a matter of discretion for the court below.[15] Where the bill makes an attack upon the constitutionality of a state statute, supported by factual allegations sufficiently strong, as here, to raise "grave doubts of the constitutionality of the Act" in the mind of the trial court, the motion to dismiss for failure to state a cause of action should be denied. This bill sets out that the exercise of rights granted by the Federal Copyright Act to control the performance of compositions for profit is prohibited by the statute; that existing contracts are impaired; property taken without compensation; recovery on extra state contracts denied and the equal protection and due process clauses of the 14th Amendment violated in manners specifically pleaded. Drastic penalties for violation

---

[14] *Polk Company* v. *Glover*, 305 U. S. 5, 9.

[15] *O'Keefe* v. *New Orleans*, 273 F. 560; *Wright* v. *Barnard*, 233 F. 329; *Doherty* v. *McDowell*, 276 F. 728; *Ralston Steel Car Co.* v. *National Dump Car Co.*, 222 F. 590, 592. Compare *Kansas* v. *Colorado*, 185 U. S. 125, 144–145; *Wisconsin* v. *Illinois*, 270 U. S. 634. *Wilshire Oil Co.* v. *United States*, 295 U. S. 100, 102–103.

of the act are provided.[16] The manner in and extent to which the challenged statute offends or complies with the applicable provisions of the Constitution will be clearer after final hearing and findings.[17] . The findings here were on the motion for interlocutory injunction and on the issue of jurisdiction.

*Other Assignments.*—The other material assignments of error to the interlocutory order specified on the appeal are addressed (1) to the lack of equity in the bill, (2) to the exercise of discretion in ordering a temporary injunction, (3) to the lack of findings before the order of temporary injunction and (4) to the failure to strike from the bill allegations as to certain sections which deal with contract relations between the Society and users of the musical compositions because these sections are not enforced by the state officers. We treat of them briefly: (1) It is clear that there is equitable jurisdiction to prevent irreparable injury, if the sections of the state statute outlawing the Society raise issues of constitutionality. The heavy penalties for violation and the prohibition of the issue of licenses or collection of fees show the need to protect complainants.[18] (2) Upon the conclusion that the motion to dismiss should be overruled, there was no abuse of discretion in granting an interlocutory injunction.[19] The damage before final judgment from the enforcement of the act as shown by the affidavits would be. irreparable. The allegations in the bill of threats of enforcement and the declaration in the affidavit of the

---

[16] Fine $50 to $5,000 and imprisonment one to ten years or either, § 8, Fla. Gen. Laws, 1937, c. 17807.

[17] *Borden's Farm Products Co.* v. *Baldwin,* 293 U. S. 194, 211–213. *Polk Co.* v. *Glover,* 305 U. S. 5.

[18] *Ex parte Young,* 209 U. S. 123, 165; *Terrace* v. *Thompson,* 263 U. S. 197, 215.

[19] *Alabama* v. *United States,* 279 U. S. 229, 231; *Ohio Oil Co.* v. *Conway,* 279 U. S. 813.

Attorney General of the State, the officer charged with supervision of enforcement,[20] of readiness and willingness "to prosecute any violations of said act," sufficiently establish the immediate danger from enforcement.[21] No objection appears as to the adequacy of the bond or the other terms of the injunction. These remain under the control of the lower court. Ordinarily it would be expected that where a temporary injunction is considered necessary to protect the rights of complainants against the allegedly unconstitutional action of state officers, under a statute, a final order would follow with all convenient speed. (3) The order of the trial court was entered April 5, 1938. The findings of fact and conclusions of law were not filed until May 17, 1938, after the first assignment of errors had pointed out the omission and after the appeal was allowed. The original assignment of error, which had relied upon the failure to comply with Equity Rule 70½ was amended to show subsequent compliance but no assignment of error was made on account of the fact that the findings were out of time. The objection was taken in the statement of points to be relied upon on the appeal and in appellants' brief in the specification of errors to be urged. Better practice dictates the filing of the finding of facts and conclusions of law before or contemporaneously with the order or decree. It would be useless, however, to reverse the order granting the temporary injunction and remand the cause. The temporary injunction would now be in order. (4) In answer to the fourth objection it may be said that the issue like that of constitutionality can be more satisfactorily disposed of upon final hearing.

*Affirmed.*

---

[20] § 10, Fla. Gen. Laws, 1937, c. 17807.

[21] *Terrace* v. *Thompson*, 263 U. S. 197, 214–16; *Cline* v. *Frink Dairy Co.*, 274 U. S. 445, 451–52.

Mr. Justice Frankfurter took no part in the consideration or decision of this case.

Mr. Justice Black, dissenting.

I believe the decree enjoining and suspending Florida's law prohibiting monopolistic price fixing should be reversed because

(1) No showing has been made that casts any doubt upon a State's power to prohibit monopolistic price fixing,

(2) Complainants (appellees here) failed to sustain their burden of showing $3,000.00 in controversy, as required by statute,

(3) The court below failed to require a bond or other conditions adequate to protect the people in Florida who might be injured by the injunction.

*First.* Do general allegations of unconstitutionality,[1] similarly general affidavits and general findings by the trial court show that the Florida statute against monopolistic price fixing is "novel, if not unique"[2] state legislation, and raise such "grave constitutional questions" that a federal court should suspend the statute to permit complainants to continue exacting monopoly tribute from the public until the court hears evidence?

The enjoined Attorney General and prosecuting attorneys of Florida do not have, and expressly disclaim any duty to enforce the statute against appellees unless they combine to fix monopolistic prices. Therefore, this injunction cannot rest upon the alleged unconstitutionality of any provisions of the statute other than those prohibiting monopolistic price fixing. And allegations of the

---

[1] Cf. *Borden's Co.* v. *Baldwin*, 293 U. S. 194, 203; *Aetna Ins. Co.* v. *Hyde*, 275 U. S. 440, 447; *Public Service Comm'n* v. *Great Northern Utilities Co.*, 289 U. S. 130, 136, 137.

[2] *Borden's Co.* v. *Baldwin*, *supra*, 203.

bill attacking other provisions of the statute raise only moot questions. If this record can be said to raise any "grave," "novel," or "unique" question at all, that question is whether a State has power to prohibit price fixing by monopolies in restraint of trade.

If the issue is not narrowed to this single point, approval is given to the enjoining of state officials from action which they have no duty to perform and have solemnly disclaimed both here and in the District Court.[3] In the absence of an interpretation by the Florida Supreme Court, to what more authoritative source or evidence may a federal court turn for the meaning of the statute, than to the decision of the highest state official charged with its enforcement? He has determined that, so far as he and the prosecuting attorneys under him are concerned, appellees may license their compositions as they please, may combine to detect and punish infringers and may operate in Florida at will, provided only that they abandon monopolistic price fixing. Even as to the statutory prohibition against price fixing, all that is before us, a practice more desirable and more in keeping with our dual form of government, previous decisions,[4] and the trend of Congressional legislation,[5] would be to refrain from federal judicial interference until the state courts are presented with an opportunity to define the statutory duties of appellants. "And . . . . the presumption is in all cases that the state courts will do what the constitution and laws of the United States require." [6]

---

[3] Cf., *Carroll* v. *Greenwich Insurance Co.*, 199 U. S. 401, 412.

[4] *Gilchrist* v. *Interborough Co.*, 279 U. S. 159, 207; *Fenner* v. *Boykin*, 271 U. S. 240, 243–4; cf., *Waters-Pierce Oil Co.* v. *Texas*, 177 U. S. 28, 43; and see Clark, Brandeis, JJ., dissenting, *Cincinnati* v. *Cincinnati & H. Traction Co.*, 245 U. S. 446, 461.

[5] 28 U. S. C. 41; c. 726, 50 Stat. 738, 48 Stat. 775, 47 Stat. 70, 43 Stat. 938, 36 Stat. 1162, amended 37 Stat. 1013.

[6] *Defiance Water Co.* v. *Defiance*, 191 U. S. 184, 194.

Judicially restraining these Florida officials from action which they declare they cannot and will not take, denies to Florida the traditional respect that has been accorded state officials by this Court.[7]

Even according to the comparatively new judicial formula here applied, the only issue is whether "novel . . . unique" or "grave constitutional questions" are raised by the charge that these state officials will perform their sole duty under the Florida statute of prosecuting appellees for violations of the prohibitions against monopolistic price fixing. Paraphrasing this formula, the question here actually becomes: When complainants charge in a federal court of equity that a State has passed, and its officers are about to enforce, a law against monopolistic price fixing, is there so much doubt about the power of the State to prohibit monopolistic price fixing that operation of the law must be enjoined and effect denied to it until evidence is heard by the Court?

Here, both the very bill upon which the injunction now approved was granted and affidavits of record establish beyond dispute appellees' flagrant violation of the Florida law by combining to fix prices. This combination apparently includes practically all (probably 95%) American and foreign copyright owners controlling rendi-

---

[7] See *Spielman Motor Co. v. Dodge*, 295 U. S. 89, 96; *Cincinnati v. Cincinnati & H. Traction Co.*, supra, 454, 455; *Virginia v. West Virginia*, 231 U. S. 89, 91; cf. *Des Moines v. City Ry. Co.*, 214 U. S. 179, 184. This injunction makes strikingly pertinent the question of Justice Harlan, dissenting, in *Ex parte Young*, 209 U. S. 123, 179 (1908): "If the Federal court could thus prohibit the law officer of the State from representing it in a suit brought in the state court, why might not the bill in the Federal court be so amended that that court could reach all the district attorneys in Minnesota and forbid them from bringing to the attention of grand juries and the state courts violations of the state act . . .?" His apprehensive prophecy has more than come true in the present case.

tion of copyrighted music for profit in the United States. Not only does this combination fix prices through a self-perpetuating board of twenty-four directors, but its power over the business of musical rendition is so great that it can refuse to sell rights to single compositions, and can, and does, require purchasers to take, at a monopolistically fixed annual fee, the entire repertory of all numbers controlled by the combination. And these fees are not the same for like purchasers even in the same locality. Evidence shows that competing radio stations in the same city, operating on the same power and serving the same audience, are charged widely variant fees for identical performance rights, not because of competition, but by the exercise of monopoly power. Since it appears that music is an essential part of public entertainment for profit, radio stations or other businesses arbitrarily compelled to pay discriminatory fees are faced with price fixing practices that could destroy them, because the Society has a monopoly of practically all—if not completely all—available music. When consideration is also given to the fact that an arbitrarily fixed lower rate is granted to a favored station itself controlled by another instrument of public communication—a newspaper—the ultimate possibilities for control of the channels of public communication and information are apparent.

We have here a price fixing combination that actually wields the power of life and death over every business in Florida, and elsewhere, dependent upon copyrighted musical compositions for existence. Such a monopolistic combination's power to fix prices is the power to destroy. Should a court of equity grant this combination the privilege of violating a state anti-monopoly law?[8] Does a

[8] Cf., *Continental Wall Paper Co.* v *Voight & Sons Co.*, 212 U. S. 227, 262, affirming 148 F. 939; *Gibbs* v. *Baltimore Gas Co.*, 130 U. S. 396, 412. *McConnell* v. *Camors-McConnell Co.*, 152 F. 321; *Pacific*

state law prohibiting such a combination present "grave constitutional questions"?

It is my position that a state law prohibiting monopolistic price fixing in restraint of trade is not "novel" and "unique" and raises no "grave constitutional questions." The constitutional right of the States to pass laws against monopolies should now be beyond possibility of controversy. "That state legislatures have the right . . . to prevent unlawful combinations to prevent competition and in restraint of trade, and to prohibit and punish monopolies, is not open to question," [9] and few have challenged the power of state legislatures to ordain that "competition not combination, should be the law of trade." [10] Surely, there is presently no basis to doubt this power and to assert that its exercise raises "grave constitutional questions." As recently as 1937, this Court held that Puerto Rico, with legislative powers not equal to, but "nearly as extensive as those exercised by any state legislature," could prohibit monopolistic price fixing as one of the "rightful subjects of legislation" upon which legislatures act. [11]

If the States have somehow lost their historic power to prohibit monopolistic price fixing combinations before

*Postal Telegraph Cable Co.* v. *Western Union Tel. Co.,* 50 F. 493; *American Biscuit & Mfg. Co.* v. *Klotz,* 44 F. 721; 1 Pom. Equity Juris. (3rd Ed.) § 402.

[9] *Waters-Pierce Oil Co.* v. *Texas* (No. 1), 212 U. S. 86, 107. "There is nothing in the Constitution of the United States which precludes a State from adopting and enforcing [statutes which secure competition and preclude combinations which tend to defeat it] . . . To so decide would be stepping backwards." *International Harvester Co.* v. *Missouri,* 234 U. S. 199, 209. See, *Atlantic & Pac. Tea Co.* v. *Grosjean,* 301 U. S. 412, 425–6; *Nebbia* v. *New York,* 291 U. S 502, 529; *Rast* v. *Van Deman & Lewis Co.,* 240 U. S. 342, 366–7.

[10] *National Cotton Oil Co.* v. *Texas,* 197 U. S. 115, 129; *Carroll* v. *Greenwich Ins. Co., supra,* 411.

[11] *Puerto Rico* v. *Shell Co.,* 302 U. S. 253, 260, 261.

presentation of evidence to a federal court, at what point in our history and in what manner did they lose it? The people have not exercised their exclusive authority, by Constitutional amendment, to strip the States of their power over price fixing combinations and thus raise monopoly above the traditional power of legislative bodies.

It was expressly conceded at the bar that Florida had the Constitutional power to prohibit price fixing combinations unless the copyright laws limited this power. And, since argument of the present case, a decision rendered by us February 13, this year, made clear the principle that the copyright laws grant no immunity to copyright owners from statutes prohibiting monopolistic practices and agreements. We there declared that "An agreement illegal [by statute] because it suppresses competition is not any less so because the competitive article is copyrighted." [12]

"Due process" has been judicially endowed with great elasticity in relation to property rights, but it is inconceivable that it would afford refuge for monopolies deemed undesirable by the people's representatives. When a legislature as a matter of public policy determines to prohibit monopolistic combinations, we cannot, under any doctrine of "due process," rightfully "review their economics or their facts." [13] And, although "due process" is invoked, can evidence either add to or take from the legislative power to permit, regulate or prohibit monopolies in the public interest?

Several of the general allegations in the bill are relied upon to justify suspension of the Florida statute until evidence is heard by a court. It is said the court should hear evidence because the "bill sets out that the exercise of rights granted by the Federal Copyright Act to control

---

[12] *Interstate Circuit, Inc.* v. *United States,* 306 U. S. 208, 230.

[13] *Central Lumber Co.* v. *South Dakota,* 226 U. S. 157, 161.

the performance of compositions for profit is prohibited by the statute . . ." But what evidence can the court hear that will assist it in comparing the statute with the copyright laws? The Florida statute does not even purport to prohibit the "performance of compositions for profit," and the enjoined officials have neither threatened, nor do they intend, to prohibit such performance. It is said the bill alleges "that existing contracts are impaired" by the statute. But no contracts can be affected unless involving prohibited monopolistic price fixing. That the Florida law prohibits the continuation and execution of monopoly practices in pursuance of price fixing agreements made before the law was passed, can be no basis for constitutional objection.[14]

It is said the bill alleges "property taken without compensation." If the statute, of itself, takes property, (and no charge of unconstitutional application of the statute is made) is evidence required to show the manner of the taking? It is said the bill alleges that the statute violates "equal protection." But the sole thing threatened is prosecution of an admitted price fixing combination—comprised of practically all the musical copyright owners and publishers in the nation. ". . . if an evil [of monopoly] is specially experienced in a particular branch of business, the Constitution embodies no prohibition of laws confined to the evil, or doctrinaire requirement that they should be couched in all embracing terms. It does not forbid the cautious advance, step by step, and the distrust of generalities which sometimes have been the weakness, but often the strength, of English legislation." [15] It is said a drastic penalty is provided for prac-

---

[14] *Waters-Pierce Oil Co.* v. *Texas* (No. 1), *supra,* 108.

[15] *Carroll* v. *Greenwich Ins. Co., supra,* 411; *Central Lumber Co.* v. *South Dakota, supra,* 160. "A legislature may hit at an abuse which it has found, even though it has failed to strike at another." *United States* v. *Carolene Products Co.,* 304 U. S. 144, 151.

ticing price fixing. What evidence will serve to enlighten the Court on the statutory penalty? That penalty is set out clearly in the statute. If it invalidates the statute, that determination should be made now.

The present case illustrates how the recently fashioned judicial formula under which state laws must be enjoined if "grave constitutional questions" are presented in a complaint, actually results in an automatic judicial suspension of state statutes upon any general complaint to a federal court. The apparently inevitable operation of this formula runs counter to the Tenth Amendment intended to preserve the control of the States over their own local legislation, and opens the door to further evasions of the Eleventh Amendment protecting the States from suits in federal courts.[16] A lower federal court's refusal in its "discretion" to suspend a state statute was recently reversed because "grave constitutional questions"—requiring evidence—were deemed raised by charges that the statute by requiring citrus fruit cans to be truthfully labeled violated the Constitution.[17] And here, where the District Court enjoined a state law in its "discretion," the injunction is sustained by a holding that evidence should be heard because "grave constitutional questions" are involved. However the lower court's "discretion" may be exercised, the formula apparently achieves but one result—state statutes are suspended.

Careful scrutiny of appellees' bill for injunction reveals no allegations indicating that Florida's power to prohibit monopolistic price fixing would, even under the formula applied, be altered by proof of any "particular economic facts . . . which are . . . properly the sub-

---

[16] Cf. *Ex parte Young*, 209 U. S. 123, Harlan, J., dissenting, 168–204; and see *Fitts* v. *McGhee*, 172 U. S. 516, 528, 530; *In re Ayers*, 123 U. S. 443, 496, 497, 505.

[17] *Polk Co.* v. *Glover*, 305 U. S. 5.

ject of evidence and of findings." [18] True, the bill alleges
that the statute of Florida and similar legislation enacted
by other States were "sponsored by an organized
group . . . for their own selfish aggrandizement . . .
without an adequate hearing being afforded to complain-
ants and others similarly situated," and that "in truth and
in fact, [the statute] was enacted not in the public inter-
est . . ." Appellees also allege that "unless the en-
forcement of this State statute is restrained . . . other
States, in addition to Florida, Montana, Washington,
Nebraska and Tennessee, may enact similar statutes . . .
all of which would work undue hardship on complain-
ants and would violate the spirit of the Constitu-
tion . . ." These are some of the strongest—if not the
strongest—of the bill's allegations deemed to raise "grave
constitutional questions." Is the temporary injunction
approved so that the federal court in Florida may hear
evidence on what constitutes the public interest of Flor-
ida? Shall the court hear evidence to determine whether
or not "unless the enforcement of this statute is re-
strained" other States, "in addition to Florida," may
similarly prohibit appellees' monopoly?

It is difficult to perceive how in the future—under
this formula—any state law, directly or indirectly af-
fecting property, can become effective until injunction
proceedings have dragged their weary way through fed-
eral courts. All state statutes might hereafter well sub-
stitute for the expression "to take effect within" a cer-
tain period of time, the words "to take effect after the
Federal courts have heard evidence to determine" their
reasonableness (wisdom). And the formula likewise fits
Congressional enactments. Had the pronouncement of this
formula not been the culmination of gradual judicial ad-
vances, it would have been everywhere recognized as a

---

[18] *Borden's Co.* v. *Baldwin, supra,* at 210.

revolutionary departure from our constitutional form of government, under which the wisdom of legislation, within the field of legislative action, was left to the judgment of elected representatives of the people.

Florida can find little comfort in the admonition that "Ordinarily it would be expected that where a temporary injunction is considered necessary . . . a final order would follow with all convenient speed." This law has now already been suspended for a year, and experience demonstrates that injunctive suspension of state laws and state action can hang in the courts for many years before receiving final disposition.[19]

*Second.* Jurisdictional Amount.

These eleven appellees alleged in their bill for injunction that they sued on behalf of themselves and the more than 1,000 other (American) members of the Society. No determination is made here "that for any member, who is a party, the matter in controversy is of the value of the jurisdictional amount"—$3,000. However, while appellees are not aided in establishing the jurisdictional amount by the "allegation that [they] . . . sued on behalf of others similarly situated,"[20] the court nevertheless holds that the jurisdictional amount is in controversy in "the value of the aggregate rights of all members" (including the more than 1,000 who have not appeared in person) to combine and fix prices in Florida.

"Assuming that such a case as this may be called a class action, and . . . could be maintained as such . . . yet that it may be properly a class action does not affect the rule against aggregation [of claims for making up

---

[19] See dissent, *McCart* v. *Indianapolis Water Co.*, 302 U. S. 419, 435, and note.

[20] *Lion Bonding Co.* v. *Karatz*, 262 U. S. 77, 86.

the jurisdictional amount], because [such aggregation] . . . is necessarily only applicable to those class actions in which several claimants to a fund are joined as plaintiffs asserting common and undivided rights therein." [21] Appellees assert no common and undivided rights in any fund [22] or property; [23] "the amount payable to each [by the Society] depends upon his contract alone." [24] Neither does appellees' bill seek, as would the traditional class or representative bill in equity, to protect group rights all claimed under and traceable to a single decree,[25] or rights "which . . . [no one plaintiff] can enforce in the absence of the" others because derived from a single security instrument.[26] In this proceeding, all that members of the Society have in common is their alleged right to violate with impunity the Florida statute against price fixing. Unless opposition to and violation of the statute can be their bond of unity, appellees have "separate and distinct demands . . . [united] for convenience and economy in a single suit, [and] it is essential that the demand of each be of the requisite jurisdictional amount." [27]

Permissible joinder of many plaintiffs as a matter of convenience and economy is not a means of enlarging the jurisdiction of the District Court. Rule 38, under which this class or representative suit was brought, did

---

[21] *Eberhard* v. *Northwestern Mutual Life Ins. Co.*, 241 F. 353, 356, referred to with apparent approval in *Lion Bonding Co.* v. *Karatz, supra.*

[22] *Smith* v. *Swormstedt,* 16 How. 288.

[23] *Beatty* v. *Kurtz,* 2 Pet. 566.

[24] *Eberhard* case, *supra,* 356.

[25] *Shields* v. *Thomas,* 17 How. 3, but see *Chapman* v. *Handley,* 151 U. S. 443.

[26] *Troy Bank* v. *Whitehead & Co.,* 222 U. S. 39, 41.

[27] *Id.* 40.

not, in fact could not, extend that jurisdiction which depends solely upon Acts of Congress.[28]

A common desire to disregard a state law cannot serve as a common and undivided interest for purposes of federal jurisdiction; [29] otherwise, all who oppose such a law can aggregate the values of their alleged individual rights so as to disregard the law, in order that they may escape the courts of a State and bring its law before a federal court. And the fact that a state law inflicts pecuniary loss upon members of a non-profit association because of their membership does not permit aggregation of the members' pecuniary interests as a basis for attack upon the law in a federal court by some members "on behalf and with the authority of all." [30] Here, the individual members have made no showing of what they as individuals have at stake—or of what all the members as a class stand to lose by virtue of the Florida law.

The enjoined state officials have only the duty to prosecute appellees if they continue to fix prices (i. e., to issue licenses) through monopolistic combinations, and these officials have expressly disavowed any intention to do more.[31] Appellees are left free to form such combinations as they please in Florida for the purpose of protecting against copyright infringements. They are here deprived by the Florida statute only of the right to com-

---

[28] *Alaska Packers Assn.* v. *Pillsbury,* 301 U. S. 174, 177; *Christopher* v. *Brusselback,* 302 U. S. 500, 505; see, *KVOS, Inc.* v. *Associated Press,* 299 U. S. 269, 279.

[29] *Pope* v. *Blanton,* 10 F. Supp. 15, 18, dismissed *per curiam* for lack of requisite jurisdictional amount in controversy, 299 U. S. 521; *Gavica* v. *Donaugh,* 93 F. 2d 173.

[30] *Rogers* v. *Hennepin County,* 239 U. S. 621. The complaint appears in the original records of this Court, No. 411, Oct. Term 1915. Cf., *Robbins* v. *Western Auto Ins. Co.,* 4 F. 2d 249, cert. den., 268 U. S. 698; *Woods* v. *Thompson,* 14 F. 2d 951, and *Illinois Bankers' Life Assn.* v. *Farris,* 21 F. 2d 1014, cert. den., 276 U. S. 621.

[31] Cf., *Carroll* v. *Greenwich Ins. Co., supra,* 412.

bine to fix prices, and the value of that right must determine the amount in controversy.[32] That right was the object which appellees' bill for injunction sought to protect from allegedly unconstitutional interference.[33] Yet, there is no evidence at all in the record from which even an inference can be drawn as to the amount, if any, individual appellees or other members might lose in Florida by selling or licensing their copyrighted articles individually (which the law permits) instead of fixing prices by monopolistic combination (which the law prohibits). No showing was made that appellees ever have made or ever will make any profit from the operations of the Society in Florida. As stated by the majority opinion, the record discloses that the business of the Society in the entire United States and sixteen foreign countries is a profitable one. But we cannot assume from this that its Florida operations are as a unit profitable. In fact, the record shows only that the entire Society had sixty thousand dollars worth of contracts in Florida in 1936. We are not told what ratable share of this sixty thousand dollars would come to any individual in the division of the entire amount among the forty-five thousand odd members affiliated with the Society (in America and abroad). Each individual member's gross income from Florida might be less than $1.50 per year.

The loss of a right to an annual gross income of $1.50 cannot amount to the loss of a right valued at ten thousand dollars—as appellees allege—on the theory that it would cost ten thousand dollars to collect the $1.50 income individually. And it is, of course, possible that if the Society in fact has no net income from Florida but operates there at a loss, each member's ratable share of

---

[32] *Scott* v. *Donald*, 165 U. S. 107, 114, 115.

[33] Cf., *Glenwood Light & W. Co.* v. *Mutual Light Co.*, 239 U. S. 121, 125, 126; *KVOS, Inc.* v. *Associated Press*, 299 U. S. 269, 277.

income from the Society will actually be increased when the unprofitable Florida operations cease because of the statute. Measuring the amount in controversy on the above theory, jurisdiction might be obtained by a federal court to enforce rights of a value far less than the jurisdictional $3,000 required by Congress. For illustration, a statute might prohibit parking of automobiles on certain city streets; an automobile owner assailing the law might be admitted to the jurisdiction of the federal court by alleging that it would cost him more than three thousand dollars to purchase a parking lot in which to park off the streets of the prohibited area. He would thus "comply" with the statute and abandon the streets in obedience to it.[34] I do not believe that jurisdiction of a federal court can be rested on measurements of the imagined cost of what a complainant conceivably could but certainly would never do as an alternative to action forbidden by statute.

The statutory monetary standard is precise and the amount in controversy therefore cannot be conjectural. "It is impossible to foresee into what mazes of speculation and conjecture we may not be led by a departure from the simplicity of the statutory provision.

"Accordingly this Court has uniformly been strict to adhere to and enforce it." [35]

---

[34] "Cost of compliance" with an assailed legislative act may be considered the measure of the amount in controversy when a right of complainant is regulated, or where he is required to take affirmative action. Cf., *Kroger Grocery Co.* v. *Lutz*, 299 U. S. 300, 301; *McNutt* v. *General Motors Acceptance Corp.*, 298 U. S. 178, 181. But appellees have not been required to take any affirmative steps, nor are they permitted to fix prices on condition that they "comply" with regulations. The fixing of prices through combinations has been prohibited. Obviously, appellees cannot be prohibited from doing that which they may also do by "complying" with the statute.

[35] *Elgin* v. *Marshall*, 106 U. S. 578, 581.

Without proof of the amount each appellee or member has in issue, how can the "aggregate amount" be fixed at any figure?

Rigid enforcement of the jurisdictional requirement will limit the interference of federal courts in state legislation and will accord with the policy of Congress in narrowing the jurisdiction of federal courts by successive increases in the jurisdictional amount.[36] "The policy of the statute calls for its strict construction." [37] Since no individual complainant has established that he has the statutory jurisdictional amount in controversy, to rest jurisdiction of a federal court on no more than the unified desire of many complainants to violate a state statute prohibiting monopolistic price fixing, does constitute a "novel, if not unique," and "grave" judicial departure from the jurisdictional requirement fixed by Congress.

*Third.* The otherwise complete suspension of Florida's law was limited only by the condition that appellees make bond of five thousand dollars payable to the Attorney General of Florida and the District Attorneys of the State. Manifestly, these officials have no individual interest in the monopoly prohibited by the Florida law. The major injuries accruing from the suspension of the law will not be inflicted upon them, but upon the people of Florida who are required to pay monopoly prices while the law remains enjoined. Thus, while the law is suspended, these non-resident appellees can carry on a monopolistic business in Florida contrary to its prohibitions, and the people of Florida who must pay monopoly prices are granted no protection. We have recently declared the governing principle that "it is the duty of a court of equity granting injunctive relief to do so upon conditions that will protect all—including the public—whose inter-

[36] See *Healy* v. *Ratta*, 292 U. S. 263, 270.
[37] *Id.*

ests the injunction may affect."[38] The injunction here was not granted upon conditions that would protect the interests of all who might be affected by it. It neither ordered the monopoly tribute exacted by appellees to be paid into court during suspension of the Florida statute, nor required a bond for the benefit of, and adequate to indemnify those who must pay this tribute until the court permits the statute to go into effect.

. Nevertheless, this Court now refuses to correct the grossly unjust failure to protect those who may suffer irreparable injury from the suspension of the Florida law on the ground that "No objection appears as to the adequacy of the bond or the other terms of the injunction. These remain under the control of the lower court." However, the lower court has already exercised its control resulting in manifestly injurious error apparent on the record.[39] And as "upon this appeal in equity the whole case is before us, we can render such decree as under all the circumstances may be proper."[40] Litigation is not a game in which justice can be awarded only to the alert and fastidious objector, particularly when—as here—a court suspends statutory rights of members of the public who, not being in court, have no opportunity to object. The injustice to the public apparent on this record violates the rudimentary principles of equity and fair play. We should neither condone nor permit it.

They who attack the constitutionality of a law, obtain its judicial suspension, and then continue to violate its

---

[38] *Inland Steel Co.* v. *United States*, 306 U. S. 153, 157.

[39] See, *Lamb* v. *Cramer*, 285 U. S. 217, 222; *United States* v. *Tennessee & Coosa R. Co.*, 176 U. S. 242, 256; Revised Rules of the Supreme Court of the United States, 27, paragraph 6; cf., *Mahler* v. *Eby*, 264 U. S. 32, 45.

[40] *United States* v. *Rio Grande Irrigation Co.*, 184 U. S. 416, 423; *Cincinnati* v. *Cincinnati & H. Traction Co.*, *supra*, 454; *Ridings* v. *Johnson*, 128 U. S. 212, 218; cf., *Patterson* v. *Alabama*, 294 U. S. 600, 607.

terms, should not benefit by the suspension, in the event the law is later held constitutional. Otherwise, a judicially granted period of immunity will reward litigants who unsuccessfully assail the constitutionality of legislation. Seemingly, the time has arrived when despite our constitutional system of government no state law can become effective until a federal court hears evidence on its constitutionality. The courts—responsible for this fundamental change—should at least protect citizens of an enacting State from disobedience to a state law permitted by an erroneous or improvident interlocutory injunction.

The interlocutory injunction should be vacated.