**Thomas W. FREDERICK, Plaintiff,**

v.

**CONAGRA, INC., Defendant.**

**Civ. A. No. 86–3533–Y.**

United States District Court,
D. Massachusetts.

May 8, 1989.

---

Vicki Harbour and Jeffery E. Rossman, Rossman, Rossman & Eschelbacher, Boston, Mass., for plaintiff.

Mark Engel, McGowan, Engel, Tucker & Garret, Boston, Mass., for defendant.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

This is a civil action arising out of the termination of the employment of plaintiff Thomas W. Frederick with defendant Con-Agra, Inc. Jurisdiction is based on diversity between the parties, 28 U.S.C. sec. 1332. The complaint contains two counts. Count One is a claim for breach of an employment contract. Count Two is a claim for fraudulent misrepresentation. The matter is before the Court on the defendant's motion for summary judgment on both counts.

Viewing the record that is now before the Court in the light most favorable to the non-moving party, and indulging all inferences favorable to that party, *Ismert and Associates, Inc. v. New England Mutual Life Ins. Co.*, 801 F.2d 536, 537 (1st Cir.

1986), the following facts could reasonably be found.

In the spring of 1986, the plaintiff Thomas W. Frederick ("Frederick") was recruited from his position as regional sales manager at Kahn's & Co. ("Kahn's"), a company engaged in the business of producing and marketing processed meats, by Bernard Zilinskas ("Zilinskas"), the Vice-President of Sales for the Eastern Area of the Armour Processed Meat Company ("Armour"). Armour is a subsidiary of the defendant ConAgra, Inc. ("ConAgra").[1] As regional sales manager with Kahn's, Frederick was based in Buffalo, New York. Frederick had received three promotions in the six years he had been at Kahn's.

Though Frederick was not seeking a change of employment, Zilinskas contacted Frederick to discuss the possibility of Frederick becoming the Northeast Regional Sales Manager for Armour.[2] Frederick had known Zilinskas since 1976–77 when Zilinskas had hired Frederick for a position with Colonial Provisions. Zilinskas and Frederick discussed the proposed job change several times, both in person and by telephone. In the course of these discussions, Zilinskas made a number of representations to Frederick, including the following: Armour wanted to hire him for a minimum of two years; Frederick would permanently be located in Armour's Braintree, Massachusetts offices by August 1, 1986; Frederick would have his own secretary; a new "Management Information System" would be available for monitoring sales and providing data for reviews; ConAgra had allocated significant money for promotional spending in the Northeast regional market; Frederick would be involved in formulating the marketing programs to be run in the region and would work on some of the product groups; only half of Frederick's salary bonuses would be contingent on company earnings, the other half to be determined by the achievement of goals to be established jointly by Frederick and Zilinskas; Frederick would be reimbursed for relocation expenses. Relying on these representations, Frederick ultimately accepted the position.

Since Armour needed Frederick immediately, but Frederick would receive a $5,000 bonus from Kahn's were he to remain with that company through June, 1986, Zilinskas arranged for Frederick to receive an interest-free loan of $5,000. This loan was to be forgiven in full provided Frederick stayed with Armour for two years, or if Armour fired Frederick before the expiration of two years from the date he was to start.[3] Based on Zilinskas's representation that he was being hired by Armour for at least two years, Frederick accepted the loan. Frederick began to work for Armour on June 2, 1986, but never signed an employment contract.

Because Armour's Braintree, Massachusetts personnel were planning to relocate shortly to new office space, Frederick worked for three weeks at Armour's offices in Cranford, New Jersey. Because the company's regional records were located in Cranford, Armour initially wanted Frederick located there. Frederick declined this offer because the cost of housing was too high in the New York—New

---

1. At Kahn's, Frederick supervised about seventeen people, including two levels of managers plus salespersons. He was responsible for sales in a large region, including upstate New York, western Pennsylvania, northern Ohio, Michigan, and Ontario, Canada. His salary at the time in question was $41,000. He had also received a $9,000 bonus from Kahn's in the last year of his employment. Additionally, he had the use of a company car, and various fringe benefits, including a vested non-contributory equity sharing plan under which he received Sara Lee stock, a stock purchase plan under which he could purchase Sara Lee stock at a 15% discount, major medical, disability and life insurance, and pension benefits.

2. This job involved the supervision of forty one people, including two levels of management personnel plus salespersons. The region included New England, upstate New York, metropolitan New York, Philadelphia, and the Washington–Baltimore area. Zilinskas and Frederick agreed to a salary of $60,000 per year, with potential bonuses totalling an additional $18,000.

3. Zilinskas told Frederick, with respect to why Frederick would receive an interest-free loan from ConAgra rather than an outright signing bonus, that the company wanted to ensure that Frederick would remain with the company for at least two years.

Jersey area. Nonetheless, for three weeks, this was his base of operations. Frederick travelled extensively during this period to meet the Division Sales Managers over whom he had responsibility. During the summer he was also engaged in relocating his family to the Braintree area and arranging for the construction of a new home in the Braintree area.

By July 7, Frederick had moved into his new offices in Braintree. On September 2, 1986, he was fired on thirty days notice for no stated cause. For the entire period of his employment, Frederick did not have a personal secretary. The new Management Information System was not functioning properly for this period and data regarding the previous year's weekly sales and budgeted goals was sometimes inaccurate. Additionally, although ConAgra apparently had planned to spend $1,000,000 for advertising and promotion in the Northeast region for fiscal year 1987 (which began June 1, 1986), the national office of ConAgra decided to take greater control over advertising and reduced the amount of money allocated to advertising and promotion at the regional level. Accordingly, Frederick was not involved in formulating the marketing programs to be run in the region. Although Zilinskas had arranged for Frederick to be made a member of the "lower salt product team," this group never met during the four months of Frederick's tenure at Armour. When Frederick left Armour in September, the bonus program for all management personnel at ConAgra for fiscal 1987 was said to be still in the process of being developed. Solely because of poor company performance in fiscal year 1987, no Armour managers at Frederick's level received any bonus. At no time during Frederick's employment did Zilinskas ever set down specific goals for Frederick.

Frederick accepted a job offer at Columbia Foods Company, a much smaller regional company, starting October, 1986. Although his salary was close to what he had expected at Armour,[4] the position offers him less opportunity for growth within the

company or, alternatively, for recruitment by another major regional or national company. By the time he was fired from Armour, his previous post at Kahn's had been filled.

## I. *Breach of Employment Contract*

Frederick never had a written employment agreement with ConAgra. He contends that a contract for employment for a specific term arose from various representations and negotiations between the parties. *See Kravetz v. Merchants Distributors, Inc.,* 387 Mass. 457, 460, 440 N.E.2d 1278 (1982) (" 'Whether there is a contract for services for a definite period of time ... depends upon all the attendant conditions surrounding the agreement, as well as upon its terms, when the latter are not specific and clear' ") (quoting *Maynard v. Royal Worcester Corset Co.,* 200 Mass. 1, 4, 85 N.E. 877 [1908] ). Frederick alleges that this term was a minimum of two years and that his termination constituted a breach of that contract. ConAgra argues that Frederick was an employee "at will," whose employment could be terminated—absent bad faith—at any time. *See Smith–Pfeffer v. Superintendent of the Walter E. Fernald School,* 404 Mass. 145, 150, 533 N.E.2d 1368 (1989) ("the general rule [is] that 'an employee-at-will contract [can] be terminated at any time for any reason or for no reason at all,' " quoting *Gram v. Liberty Mut. Ins. Co.,* 384 Mass. 659, 668 n. 6, 429 N.E.2d 21 [1984] ); *see also Fortune v. National Cash Register Co.,* 373 Mass. 96, 100–101, 104, 364 N.E.2d 1251 (1977) (termination of a written employee-at-will contract, which contains implied covenant of good faith and fair dealing, constitutes breach of contract if not done in good faith).

ConAgra asserts in the alternative an affirmative defense: even if a contract of employment existed between it and Frederick an action for breach of that contract is barred by the Massachusetts Statute of

---

4. Frederick earned $55,000 and a $10,000 bonus his first year at Columbia. His second year salary was $60,000 per year, with possible bonuses of $12,000 per year contingent on job performance.

Frauds.[5] In response, Frederick argues that ConAgra is estopped from so arguing because Frederick reasonably relied to his detriment on certain employment promises. *See Hoffman v. Optima Systems, Inc.,* 683 F.Supp. 865, 869 (D.Mass.1988) (citing Restatement [Second] of Contracts, sec. 139[1]).

■ Considering first the affirmative defense, Massachusetts law is well settled that where a party against whom enforcement of an oral contract is sought has made a material misrepresentation, that party may be estopped from raising the statute of frauds defense. *Greenstein v. Flatley,* 19 Mass.App.Ct. 351, 356, 474 N.E. 2d 1130 (1985). The elements which preclude this defense under the estoppel doctrine are clear:

> "(1.) A representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made. (2.) An act or omission resulting from the representation, whether actual or by conduct, by the person to whom the representation is made. (3.) Detriment to such person as a consequence of the act or omission."

*Cellucci v. Sun Oil Co.,* 2 Mass.App.Ct. 722, 728, 320 N.E.2d 919 (1974), *aff'd* 368 Mass. 811, 331 N.E.2d 813 (1975), (quoting *Industrial Bankers of Mass., Inc., v. Reid, Murdoch & Co.,* 297 Mass. 119, 124, 8 N.E.2d 19 [1937]) (citations omitted). State and federal courts in Massachusetts have consistently held that the estoppel doctrine may apply to enforce oral contracts in the context of a statute of frauds

defense. *See Hoffman,* 683 F.Supp. at 869 (citing state cases).

In the instant case, Frederick alleges that he did reasonably rely, to his detriment, on representations made by Zilinskas, ConAgra's employee and agent for this purpose. Based on the record before the Court, a jury would be warranted in finding that certain oral representations were made by Zilinskas for the purpose of inducing Frederick to leave his job with Kahn's and to join Armour. Sufficient facts exist to justify the conclusion that Frederick, relying on these representations, moved his family from Buffalo, New York to Braintree, Massachusetts and contracted for the construction of a new home near his place of employment. A jury would also be warranted in finding that Frederick's reliance and his consequent actions, in light of his subsequent firing, worked to his detriment. Therefore, the Massachusetts Statute of Frauds does not bar Frederick's claim for breach of contract as matter of law.[6]

■ Turning now from ConAgra's affirmative defense to Frederick's underlying claim, the following facts reasonably could be found, which facts would warrant a finding of employment for a specific term. It is undisputed that when Frederick was hired he received a confirmatory letter from Wanita Zarumba, Director of Human Resources for Armour, offering him "a starting salary of $2,307.70 bi-weekly or $60,000 annually [to] be supplemented with an interest free loan in the amount of $5,000, forgiven after the completion of

---

**5.** Mass.Gen.L. ch. 259, sec. 1 provides, in pertinent part:

No action shall be brought:

\* \* \* \* \* \*

Upon an agreement that is not to be performed within one year from the making thereof....

*See Irving v. Goodimate,* 320 Mass. 454, 458, 70 N.E.2d 414 (1946).

**6.** The cases cited by ConAgra in its Reply Brief are not to the contrary. In *McMorrow v. Rodman Ford Sales, Inc.,* 462 F.Supp. 947, 949 (D.Mass.1979), then Chief Judge Caffrey of this District found as matter of fact that the plaintiff had neither established an estoppel to a statute of frauds defense to a breach of employment

contract claim nor met his burden of proof on the claim for deceit. In *Davis v. Sweetheart Plastics, Inc.,* 635 F.Supp. 849 (D.Mass.1986), Judge McNaught granted summary judgment to the defendant employer on an alleged breach of an oral contract. The necessary ground of decision on the estoppel issue in *Davis,* however, was the absence of any cognizable reliance on the part of the plaintiff employee, who sought additional supplemental retirement benefits based on oral promises allegedly made by his employer before the plaintiff's retirement. These decisions obviously rest on their facts and, being factually distinguishable from the instant case, cannot control the outcome here.

two years employment." *See* Plaintiff's Statement of Opposition and Memorandum in Opposition to ConAgra's Motion for Summary Judgment, Exhibit F. This, without more, ordinarily would not suffice to create a contract for a specific term of years. *See Lowenstein v. President and Fellows of Harvard College,* 319 F.Supp. 1096, 1097–98 (D.Mass.1970). But in this case, there is more. A jury would be warranted in finding that Frederick, in his negotiations with Zilinskas, was led to believe that he figured in Armour's long-term plans and that he was being hired for a minimum of two years. Supporting the inference that Zilinskas represented that Armour intended to hire Frederick for at least a two year period are the terms of the two year loan Armour struck with Frederick, which provided that after Frederick had been with Armour two years the loan would be forgiven. A reasonable inference is that the loan was intended as an incentive for Frederick not to leave before the end of his two year period. What representations actually were made during negotiations, the true purpose of the two year loan, the ultimate question of the existence of an agreement for employment for a specific term, are questions of material fact, genuinely in dispute. Consequently, ConAgra's motion for summary judgment as to Count I, Frederick's breach of contract claim, is denied. *See Riley v. Cameron and Colby, Inc.,* No. 86–2287–C, slip op. at 3–5, 1987 WL 17537 (D.Mass. August 31, 1987) (Caffrey, S.D.J.) (denying summary judgment on similar reasoning).

## II. *Fraudulent Misrepresentation*

Count II of Frederick's Complaint alleges as a separate claim that in order to induce Frederick to enter its employ ConAgra made various false representations to him, which caused Frederick to act to his detriment. In support of its motion for summary judgment on this Count, ConAgra argues the following: that the allegations are not pleaded with specificity sufficient to survive the particularity requirements of Fed.R.Civ.P. 9(b); that any alleged misrepresentations were merely false statements of opinion and therefore not actionable;

and that there is no evidence either that the alleged misrepresentations were actually false or that they caused Frederick to take any adverse action.

Treating these points severally, first, "[i]t is well-settled that Rule 9 'requires specification of the time, place, and content of an alleged false representation, but not the circumstances or evidence from which fraudulent intent could be inferred.'" *Wayne Investment, Inc. v. Gulf Oil Corp.,* 739 F.2d 11, 13 (1st Cir.1984) (quoting *McGinty v. Beranger Volkswagen, Inc.,* 633 F.2d 226, 228 [1st Cir.1980]); *see also Hoffman v. Optima Systems, Inc.,* 683 F.Supp. 865, 867–68 (D.Mass.1988). The purpose of this rule is not only to provide fair notice of fraud claims but also to prevent a putative plaintiff from suing first and fishing for a cause of action later in discovery. *See Hayduk v. Lanna,* 775 F.2d 441, 443 (1st Cir.1985). As such, the rule is usually employed as a mechanism to address the adequacy of the pleadings in a motion to dismiss, not—as here—invoked to support a motion for summary judgment brought at the close of discovery.

■ However this may be, Frederick has satisfied all the required elements of specificity under Rule 9(b). Frederick's allegations essentially are that Armour, primarily through Zilinskas, made certain representations to him during negotiations about Frederick joining Armour. These negotiations, conducted in the summer of 1986, concerned the terms and conditions of Frederick's employment with Armour. The representations were false. These allegations, which do not—and need not—directly aver actual fraudulent intent on Zilinskas' part, are sufficient under Rule 9(b).

■ It has been said that erroneous predictions as to future actions of third persons do not make out a cause of action for fraud or deceit. *Liberty Leather Corp. v. Callum,* 653 F.2d 694, 698 (1st Cir.1981). Where one of the parties to a transaction possesses superior knowledge about the matter to which such representations relate, Massachusetts law recognizes an exception to the rule. *Cellucci v. Sun Oil*

*Co.*, 2 Mass.App.Ct. 722, 730, 320 N.E.2d 919 (1974); Williston, *Contracts* sec. 1496, at 373–74 (3d ed. 1970).

The pertinent issues of fact relate to how Armour planned to make use of Frederick in its marketing programs, what monies had been set aside by ConAgra for Armour's advertising and promotional needs, what conditions Frederick would be working under, the length of time for which he was being hired, and whether he was to have a special, favorable bonus arrangement. Zilinskas was in a superior position to know these facts. Accordingly, that the representations may in part have related to future events is irrelevant to the Court's inquiry. Where a representation of fact is made by one in a superior position to know of its truth, a plaintiff who relied on the false representation to his detriment need not allege that the person who made the statement had actual knowledge of the statement's falsity. *See Nickerson v. Matco Tools Corp.*, 813 F.2d 529, 530 (1st Cir. 1987) (where a defendant's agent was in a superior position to know, "under Massachusetts law [the plaintiff] need not prove that [the defendant's agent actually] knew his statements [were] false" to state a claim for deceit).

Here, there are facts sufficient for a jury to conclude that Zilinskas made representations which, as it turned out, were false. Specifically, there is evidence that Zilinskas represented that Armour actually meant to keep him for two years, that Armour had plans for extensive marketing and promotional programs in which Frederick would be involved, that Frederick's bonuses would be partly determined with reference to the achievement of goals set jointly by Frederick and Zilinskas, and that Frederick would get the benefits of a personal secretary and of an advanced information management system. This evidence is sufficient for a jury to conclude that these representations were not true or, to the extent that they related only to future events, that Armour knew they were not likely to come to pass. Additionally, there is adequate evidence on the record before the Court that Frederick actually relied upon these representations.[7] There being issues of material fact genuinely in dispute on Count II, ConAgra's motion for summary judgment on this claim is denied.

### III. *The Amount–in–Controversy Controversy*

ConAgra contests this Court's subject matter jurisdiction as well, arguing in this motion that Frederick cannot possibly recover more than $10,000 in damages.

The Supreme Court has established the test to be applied in determining whether the necessary jurisdictional amount is present to confer subject matter jurisdiction on a federal court sitting in diversity:

> The rule governing dismissal for want of jurisdiction in cases brought in the Federal court is that ... the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal.

*St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 288–89, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938) (footnotes omitted).

Although the plaintiff's allegations that the necessary amount is present, if unchallenged, suffices, the plaintiff has the burden of showing that the actual amount in controversy exceeds the jurisdictional minimum. *Gibbs v. Buck*, 307 U.S. 66, 72, 59 S.Ct. 725, 729, 83 L.Ed. 1111 (1939). Thus, read in conjunction with *Red Cab*, *Gibbs* stands for the proposition that a plaintiff facing a motion to dismiss on this ground has the burden of proving jurisdiction by showing that it does not appear to a legal certainty that its claim is for less than the jurisdictional amount. The question be-

---

**7.** Frederick's Complaint alleges that he accepted employment in reliance upon statements made by Zilinskas, the terms of the letter formally offering him the job, and the contents of a written Employee Handbook outlining ConAgra's policies and benefits. Complaint at para.

**15.** But Frederick's own deposition testimony reveals that he did not rely on anything other than the oral conversations with Zilinskas in taking the job. *See* ConAgra's Motion for Summary Judgment, Exhibit B at 36.

fore the Court, then, is whether it is legally certain that Frederick will be able to prove no more than $10,000 for damages in this lawsuit. *See Duchesne v. American Airlines, Inc.*, 758 F.2d 27, 29 (1st Cir.1985).

■ Frederick alleges damages including loss of present income and benefits, loss of anticipated future income and benefits, losses associated with the move from Buffalo to Boston, and damages to his business reputation and prospects.[8] While not addressing the issue of what damages, if any, will be recovered, this Court cannot say that it appears "to a legal certainty" that Frederick will not recover more than $10,000. In the move from Buffalo to Boston, Frederick incurred expenses and fees related to housing, which he contends were to have been reimbursed by ConAgra. Clearly, his personal life was disrupted by the move. Any provable loss of bonus potential aside, Frederick has lost salary income for September, 1986 to September, 1987 of $5,000. Additional benefits included in his compensation package at Kahn's (including a pension plan which had not yet vested when he was recruited by Armour) conceivably could be recoverable. On this record, the Court cannot say as matter of law that Frederick cannot recover more than $10,000 in this action. ConAgra's motion to dismiss for lack of subject matter jurisdiction is therefore denied.

SO ORDERED.

---

8. One of Frederick's claims sounds in contract and one in tort. Contract damages are limited to those damages caused by the breach that the parties as reasonable people should have contemplated as a probable consequence of the breach. *John Hetherington & Sons, Ltd. v. William Firth Co.*, 210 Mass. 8, 21, 95 N.E. 961 (1911); *Redgrave v. Boston Symphony Orchestra, Inc.* 557 F.Supp. 230, 234 (D.Mass.1983)

(Keeton, J.), *aff'd in part and vacated in part on other grounds* 855 F.2d 888 (1st Cir.1988), *cert. den.* — U.S. ——, 109 S.Ct. 869, 102 L.Ed.2d 993 (1989). Tort claims are not so limited and may include, for instance, damage to professional reputation and damages associated with the disruption of one's personal life. *See McCone v. New England Tel. & Tel. Co.*, 393 Mass. 231, 234 n. 8, 471 N.E.2d 47 (1984).