The B. F. GOODRICH COMPANY, a corporation of the State of New York, and Cabo Rojo Manufacturing Corp., a corporation of the Commonwealth of Puerto Rico, Plaintiffs,

v.

A. T. I. CARIBE, INC., a corporation of the State of Delaware, Defendant.

Civ. A. No. 4590.

United States District Court,
D. Delaware.

Oct. 25, 1973.

Edmund D. Lyons, Edouard F. von Wettberg, III, and Edward M. McNally, of Morris, James, Hitchens & Williams, Wilmington, Del., and R. G. Jeter, Akron, Ohio, of counsel, for plaintiffs.

James T. McKinstry, of Richards, Layton & Finger, Wilmington, Del., Donald J. Mulvihill and Laurence T.

Sorkin, of Cahill, Gordon & Reindel, Washington, D. C., and O'Neill & Borges, San Juan, P. R., of counsel, for defendant.

### OPINION

CALEB M. WRIGHT, Senior District Judge.

In June, 1972, plaintiffs B. F. Goodrich Company (hereinafter referred to as BFG) and Cabo Rojo Manufacturing Corporation (hereinafter referred to as CRM), its wholly-owned subsidiary, negotiated a sale to defendant A.T.I. Caribe (hereinafter referred to as ATI) of the assets of a canvas footwear plant at Cabo Rojo, Puerto Rico. The complaint consists of four causes of action arising out of the agreement of sale.[1] In the first cause of action, plaintiff CRM alleges a default by ATI of payment for work in progress and inventory at the Cabo Rojo plant. CRM alleges in the second cause of action that ATI breached its agreement by failing to arrange for the continued leasing of certain machinery at the plant. In the third cause of action, BFG alleges a default of an installment payment for inventory covered by the contract of sale. In the fourth cause of action, evidently the heart of this litigation, BFG alleges infringement of its registered trademarks *Goodrich, B. F. Goodrich,* and *Hood* by defendant's use of these marks on canvas footwear produced at the Cabo Rojo plant.

This case is presently before the Court on the motions of ATI for partial summary judgment on the fourth cause of action and to dismiss the first three causes of action for want of subject-matter jurisdiction. For the reasons set forth in this opinion, the Court denies the motion for partial summary judgment and the motion to dismiss.

### *Motion for Partial Summary Judgment*

ATI makes two alternative arguments in support of its motion for partial summary judgment, both of which urge the legal conclusion that ATI, not BFG is the owner of the disputed trademarks. First, ATI argues that the written agreement between BFG and ATI clearly transfers ownership of the disputed marks to ATI and that the parol evidence rule precludes consideration of any oral evidence varying the terms of this agreement. Upon consideration of the terms of the contract and the applicable law, the Court determines that the parol evidence rule does not permit summary judgment here.

The parties dispute whether the law of Puerto Rico, where the relevant agreements were executed and where the footwear plant is located, or the federal common law governs the construction of this contract. The trademarks at issue here are all federally registered. The fourth cause of action alleges only trademark infringement, although disposition of that cause of action will depend on contract law as well as trademark law. Since jurisdiction is determined solely on the basis of the allegations in the complaint, the fourth cause of action is subject to the trademark jurisdiction of this Court, 28 U.S.C. § 1338(a). American Dairy Queen Corporation v. Augustyn, 278 F.Supp. 717 (N.D.Ill.1967); 4 Callmann, The Law of Unfair Competition, Trademarks and Monopolies § 91.-1(b) at 354 (3rd ed. 1968). This Court

---

1. There are five writings constituting the agreement between the parties in this case: a letter agreement of June 9, 1972; a Closing Agreement between B. F. Goodrich and A.T.I. Caribe dated June 26, 1972; a companion Closing Agreement between Cabo Rojo Manufacturing and A.T.I. Caribe dated June 26, 1972; a bill of sale from B. F. Goodrich to A.T.I. Caribe dated June 26, 1972.; and a bill of sale from Cabo Rojo Manufacturing to A.T.I. Caribe dated June 26, 1972. The briefs and oral arguments of both parties have made frequent reference to all of these writings, and the Court conceives that all of these documents comprise the "contract" at issue here. It should be noted that, as will appear more fully below, even if the Closing Agreement between Goodrich and A.T.I. alone were considered the "contract" for purposes of defendant's motion for summary judgment, that motion would have to be denied because of the ambiguity of that Agreement.

is required to refer to federal law to determine which party has rights in the marks. Campbell Soup Co. v. Armour & Co., 175 F.2d 795 (3rd Cir. 1949); National Fruit Product Co. v. Dwinell-Wright Co., 47 F.Supp. 499 (D.Mass. 1942), aff'd, 140 F.2d 618 (1st Cir. 1944); 4 Callmann, *supra*, § 93.1(b) at 413–416.[2]

■ However, the clear intention of the parties at the time of formulating their agreement, as disclosed by Paragraph 10 of the Closing Agreement between BFG and ATI, was that it was to be interpreted according to the laws of Puerto Rico:

> *Applicable Law.* This Agreement is being delivered and is intended to be performed in the Commonwealth of Puerto Rico, and shall be construed and enforced in accordance with the laws of such Commonwealth.

In absence of some contrary public policy, this consensual choice of law is controlling in federal courts, Lauritzen v. Larsen, 345 U.S. 571, 588–589, 73 S.Ct. 921, 97 L.Ed. 1254 (1953); Tele-Controls, Inc. v. Ford Industries, Inc., 388 F.2d 48, 51 (7th Cir. 1967); Consolidated Jewelers, Inc. v. Standard Financial Corp., 325 F.2d 31 (6th Cir. 1963). Therefore, the parol evidence rule of Puerto Rico governs the interpretation of this agreement.

■■ Section 25 of the Law of Evidence of Puerto Rico, the statute most pertinent to parol evidence, reads:

> When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore, there can be between the parties and their representatives, or successors in interest, no evidence of the terms of the agreements other than the contents of the writing, except in the following cases:
>
> 1. Where a mistake or imperfection of the writing is put in issue by the pleadings.
>
> 2. Where the validity of the agreement is the fact in dispute.
>
> But this section does not exclude other evidence of the circumstances under which the agreement was made or to which it relates, as defined in section 1671 of this title, or to explain an extrinsic ambiguity, or to establish illegality or fraud. The term "agreement" includes deeds and wills, as well as contracts between parties.—Code Civil Proc., 1933, § 387.[3]

This statute is consistent with the general common law rule of parol evidence and has been summarized succinctly as providing, "if the terms of a contract are clear the literal interpretation controls." American Radiator & Standard Sanitary Corp. v. Maryland Casualty Co., 374 F.2d 839, 841 n. 8 (1st Cir. 1967). Since this Court finds ambiguity in the language of one of the key provisions of the contract, it cannot limit its examination of the intention of the parties to their written agreement alone, and parol evidence will be required to resolve the ambiguity.

The letter agreement of June 9, 1972, states, "All trademarks utilized by us

---

2. Although federal courts have routinely applied federal common law to questions of infringement of federally registered trademarks, the problem of which law should govern is not entirely free of doubt. Judge Goodrich thus defined the problem: "The trade-mark registration statute expressly confers jurisdiction on federal courts for litigation arising under it. But, on the other hand, federal registration does not create a trade-mark. The trade-mark comes from use, not registration, and the right to it is in the nature of a property right based on common law. When we have an express grant of jurisdiction to federal courts to hear and determine a matter which is essentially one of state property, to which precedents do we turn, federal or state?" Campbell Soup Co. v. Armour & Co., 175 F. 2d at 796–797 [citations omitted].

3. Section 1671, also known as Section 28 of the Law of Evidence of Puerto Rico, provides: "For the proper construction of an instrument, the circumstances under which it was made, including the situation of the subject of the instrument and of the parties to it may also be shown, so that the judge be placed in the position of those whose language he is to interpret." Code Civil Proc., 1933, § 390.

[BFG] in the production of injection molded footwear will be transferred to you [ATI] at no cost but are attached as intangible assets to the machinery, equipment, molds, dies, and lasts." Goodrich admits that the trademarks at issue in this litigation were utilized in the production of footwear at Cabo Rojo.[4] Thus, had this letter agreement been the only writing between the parties, it would be beyond question that the disputed marks were intended to be assigned to ATI.

However, the substantive provisions of the Closing Agreement of June 26, 1972, between BFG and ATI reasonably convey a different meaning. The crucial paragraph of that Agreement (¶ 1(d)(II)) recites that Seller (BFG) shall convey to Purchaser (ATI) for the consideration described in the agreement:

> All of Seller's trademarks and trade names which have been used in the production and marketing of the injection molded footwear produced at CRM's manufacturing facility at Cabo Rojo, Puerto Rico, which shall be transferred to purchaser on or before July 15, 1972, by separate assignments from Seller in appropriate form for recording.

This provision can reasonably be read to convey either *all* of Seller's trademarks used at Cabo Rojo or *only* those trademarks used at Cabo Rojo that were to be included in separate assignments at a future date. The meaning of this provision thus depends on whether the parties intended the final clause ("which shall be transferred . . .") to describe the time the trademarks were to be transferred or the identity of those trademarks to be transferred.

The ambiguity of this key provision of the Closing Agreement is not diminished by reference to other passages in the Closing Agreement. The introductory clause of the Agreement refers to "certain trademarks used by Seller" and can reasonably be read to support either of the contentions that the contract intended to convey all or less than all of BFG's trademarks used at Cabo Rojo.[5] Further, Paragraph 1(1) of the Agreement recites, "The sale and delivery to Purchaser of all Seller's trademarks and trade names included hereunder are hereby acknowledged by the Seller" and does not clarify which trademarks were transferred. Finally, the warranty section of the Agreement, ¶ 3(g), acknowledges, "The trademarks described in Exhibit 1(d)(II) hereof are all of Seller's trademarks which have been used by Seller or CRM in connection with the production or sale of injection molded footwear" but is rendered ambiguous by the fact that no Exhibit 1(d)(II) was attached to the Agreement or, apparently, was ever prepared.[6] Taken as a whole, then, the Closing Agreement is ambiguous on the key issue of whether all or some undefined number less than all of BFG's trademarks used at Cabo Rojo were thereby conveyed to ATI.

---

4. Plaintiffs' Answering Brief in Opposition to Defendant's Motion to Dismiss and Motion for Summary Judgment, p. 22 n. 10.

5. The clause reads, in relevant part, "WHEREAS the parties have reached an understanding with respect to the sale by Seller and the purchase by Purchaser of certain inventory of Seller produced at the injection molded footwear manufacturing facility of Seller's wholly owned subsidiary, Cabo Rojo Manufacturing Corp. ('CRM') at Cabo Rojo, Puerto Rico, and certain trademarks used by Seller in connection with said production . . . ."

6. Plaintiffs urge that the "missing exhibit" alone is sufficient evidence that the contract is ambiguous and not "integrated" to avoid the parol evidence rule. However, the context of the reference to the "missing exhibit" is the warranty section of the contract, wherein BFG guarantees to ATI that it owned all of the tangible and intangible assets it purported to convey. This Court rejects the contention that a seller may, by omissions from its warranty provisions in a contract, defeat a conveyance otherwise clearly undertaken by the substantive provisions of the contract. It is clear in the instant case, nevertheless, that this warranty provision does not resolve an ambiguity already present in the substantive contractual language.

The third writing concerning the transfer of trademarks from BFG to ATI is the Bill of Sale executed on June 26, 1972.[7] The Bill of Sale, like the letter agreement of June 9 and unlike the Closing Agreement of June 26, seems unambiguously to have envisioned transfer of all of BFG's trademarks used at Cabo Rojo. The Bill of Sale provided for the sale of all of BFG's properties used in the operation of the plant at Cabo Rojo, including but not limited to:

> All of the machinery, equipment, office equipment, improvements, installations, appliances, furniture, fixtures and other fixed and tangible assets; good will, trade names, and trade marks, service marks and applications therefor, labels and other trade rights as described in a certain agreement between B. F. Goodrich Company and Arkansas Technical Industries, Inc. dated June 9, 1972 including all copyrights, and applications therefore and the entire inventory of finished goods, work in process and raw materials, including goods and materials intransit [sic] together with all claims, rights and causes of action arising out of any of the foregoing;

> but this sale shall not include equipment leased B. F. Goodrich Company by third parties.

In summary, the sequence of written agreements on the transfer of the trademarks includes a writing referring to the sale of all trademarks used at Cabo Rojo, a writing referring ambiguously to the sale of either all or less than all of the trademarks, and a bill of sale referring to all of the trademarks. Defendant points out the repeated use of the term "all trademarks" in these documents and argues vigorously that since "all" means "all", the trademarks in issue were unquestionably conveyed to defendant by these agreements. The teaching of Justice Holmes is pertinent here. He wrote in Towne v. Eisner, 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372 (1918), "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." In order to discover the living thought that animated the parties to express themselves in ambiguous and conflicting ways, the trier of fact in this case will have to inquire into all the circumstances surrounding the agreement to transfer the trademarks.[8] The parol evidence law of Puerto Rico requires no less.[9] Since there is a genuine issue as to the meaning of a material provision of this contract, Rule 56(c), Federal

---

7. The two other writings in this sale agreement, the Closing Agreement and Bill of Sale between CRM and ATI, also refer to the conveyance of trademarks. However, these documents are not relevant here because all of the plaintiffs' trademarks used at Cabo Rojo were actually owned by BFG, not CRM.

8. For example, the affidavit of A. J. Ashe, a BFG Vice President, avers that during the negotiations between the parties, "it was the clear understanding and intent of the parties, that the only registered trademark to be assigned pursuant to that agreement was EXCEL, that none of the Hood, BFG or B. F. Goodrich trademarks or trade names were to be assigned and that BFG would assign the brand names used by it in the production of injection molded shoes at Cabo Rojo as of the date of the agreement between the parties." (¶ 10) The affiant further avers, "Pursuant to to the terms of aforesaid agreements [the agreements of June 9 and June 26, 1972], BFG assigned its brand names and the trade-

mark Excel by appropriate assignments dated July 12, 1972. . . . No complaint was ever received as to the sufficiency of trademarks or trade names assigned until after BFG complained to Caribe of the unauthorized use of its trademark and trade names." (¶ 11) Of course, the credibility of this evidence and the inferences to be drawn therefrom will have to be ascertained by the trier of fact.

9. See text of Section 1671, quoted at n. 3, *supra*. In Miranda v. Editorial El Imparcial, Inc. et al., (1971, unpublished) the Supreme Court of Puerto Rico said, "We have repeatedly held the § 25 of the Law of Evidence does not bar extrinsic, oral, or written evidence in all the cases about circumstances which show the existence of certain conditions precedent of the contract or about the invalidity or uneffectiveness [sic] of specific pacts of the contract." [citations omitted] *Miranda* at p. 45.

Rules of Civil Procedure, forbids summary judgment on its literal meaning.[10]

As an alternative ground for summary judgment, defendant urges that, as a matter of law, the sale of all the assets and goodwill of the Cabo Rojo operation transferred the trademarks used in production at that plant "automatically", absent a specific reservation by plaintiffs in the written agreements. Defendant relies on the doctrine of United States Ozone Co. v. United States Ozone Co., 62 F.2d 881, 885 (7th Cir. 1932):

> Trade-mark rights are assignable by the owner with the business or the right to make or sell the commodity which it distinguishes or identifies . . . and, in the absence of evidence to the contrary, will be assumed to have passed, without formal assignment, with the business when the business with which the trade-mark has been identified is sold or transferred. [Citations omitted]

See, also, President Suspender Co. v. Macwilliam, 238 F. 159 (2nd Cir. 1916), cert. denied, 243 U.S. 636, 37 S.Ct. 399, 61 L.Ed. 941 (1917); Replogle v. Air-Way Co., 52 App.D.C. 364, 287 F. 765 (1923); Holly Hill Citrus Growers Assn. v. Holly Hill Fruit Products, Inc., 75 F.2d 12 (5th Cir. 1935); Lantz Bros. Baking Co. v. Grandma Cake Co., 161 F.2d 739, 34 C.C.P.A. 1073 (1947); Loma Linda Food Co. v. Thomson & Taylor Spice Co., 279 F.2d 522, 47 C.C.P.A. 1071 (1960). However, all of the cases applying the "automatic transfer" doctrine involved a sale of the entire going business associated with the trademark in dispute, where the contract of sale made no mention of the convey-

ance of the trademark. The defendant has cited no authority, and the Court's own investigation has failed to discover any, for the proposition that the transfer, as here, of a wholly-owned subsidiary, using the *same trademarks* as those actively used by the parent company on other products, automatically vests the right to use the common trademarks in the transferee.[11] Defendant's reply brief offers several authorities holding that parties may legitimately agree to such a transfer, e. g., Application of E. I. DuPont de Nemours & Co., 476 F.2d 1357 (C.C.P.A.1973); Blaw-Knox Co. v. Siegerist, 300 F.Supp. 507 (E.D.Mo. 1968), aff'd and modified, 414 F.2d 375 (8th Cir. 1969); 3 Callmann, *supra*, § 78.1, at 429–30 and cases there cited. Those authorities do not resolve the instant case because the question of whether the parties so agreed is still undetermined.

Before grafting an addition onto the doctrine of automatic trademark transfer with the sale of a going business, such as defendant seeks, a court must consider that the underlying purpose of trademark law in this connection is protection against consumer confusion. Syntex Laboratories, Inc. v. Norwich Pharmacal Co., 315 F.Supp. 45 (S.D.N.Y.1970), aff'd, 437 F.2d 566 (2nd Cir. 1971). It does not appear in the abstract that consumer confusion as to the source and reliability of products would be reduced if every time a parent company sold one of its subsidiary operations using the same trademarks on related products, the right to use the common trademarks passed to the purchaser absent an express reservation in the sale

---

10. Rule 56(c) authorizes summary judgment when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."

11. BFG presently uses the *Goodrich* trademark on adhesives such as rubber cement; valves, belting, and hose; tires; waterproof coats, jackets, boots and shoes made partly of rubber; dental, medical, and surgical appliances made of rubber; rubber bands and other products. BFG presently uses the *B. F.* *Goodrich* trademark on sheet rubber; adhesives, anti-freeze; pipe and pipe-fittings; lubricants; electric storage batteries; pillows; mattresses and cushions; tire; rubber gloves, aprons, pants, baby pants, and overshoes; plastic film; elastic thread; surgical, pharmaceutical and hospital supplies; ring life-buoys; floats and other items. BFG uses the *Hood* trademark on sheet rubber film; fabric coated with rubber; rubber gloves; tires; rubber or plastic boots, shoes, and overshoes.

agreement; rather, the reverse would appear to be true. Therefore, the Court cannot find that the sale of the Cabo Rojo operation transferred the *Goodrich, B. F. Goodrich,* and *Hood* trademarks to the defendant as a matter of law, and summary judgment on this ground also must be denied.[12]

### Motion to Dismiss

■ Defendant has moved to dismiss the first three causes of action for want of subject-matter jurisdiction, Rule 12(b)(1), Federal Rules of Civil Procedure. To the extent that defendant's arguments were premised on the dismissal of the trademark infringement claim on summary judgment, those arguments are no longer applicable. With respect to the third cause of action, the pleadings and affidavits show incontestably that plaintiff BFG and defendant ATI have diverse citizenship and principle places of business and that the amount in controversy exceeds $10,000. Therefore, this Court has diversity jurisdiction over the third cause of action pursuant to 28 U.S.C. § 1332, and defendant's motion respecting this cause is denied.[13]

■ With respect to the first two causes of action, in which plaintiff CRM alleges that ATI has failed to fulfill contractual obligations, ATI moves to dismiss for want of diversity. CRM is organized under the laws of Puerto Rico and has its principal place of business in Ohio. ATI is organized under the laws of Delaware, and its principal place of business is presently in dispute. By their amended complaint, plaintiffs allege that ATI has its principal place of business at Batesville, Arkansas. ATI contends that its principal place of business is Puerto Rico. According to the provisions of 28 U.S.C. § 1332(a), (c), (d), if ATI has its principal place of business in Puerto Rico, diversity jurisdiction is lacking.[14]

■ On the basis of the affidavits and depositions available to the Court at this time, it appears that ATI's principal place of business is Puerto Rico.[15] This is particularly so in light

12. Plaintiffs assert that the *Ozone* doctrine does not govern this case not only because BFG uses the disputed trademarks on items other than canvas footwear, but also because BFG sold only a part of its footwear business to ATI. The remainder of the business, involving shoes produced outside Puerto Rico, was sold to the Converse Rubber Company. The Court has not been required to reach this issue, because the *Ozone* doctrine is inapplicable on other grounds.

13. Defendant has asserted that the third cause of action would have to be dismissed if it were determined that CRM, plaintiff in the first two causes of action, does not have diverse citizenship from defendant. Defendant has offered no authority for the proposition that where there is improper joinder of a non-diverse party, the claims of a diverse party as well as those of the non-diverse party must be dismissed. Surely the requirement of complete diversity, Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806), would be satisfied by dismissal of the non-diverse claims alone.

14. The diversity statute, 28 U.S.C. § 1332, provides in relevant part:
   (a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and is between—
   (1) citizens of different States;
   \*　　\*　　\*　　\*　　\*
   (c) For the purposes of this section and section 1441 of this title, a corporation shall be deemed a citizen of any State by which it has been incorporated and of the State where it has its principal place of business . . . .
   (d) The word "States", as used in this section, includes the Territories, the District of Columbia, and the Commonwealth of Puerto Rico.

This Court has the power to determine the facts requisite to jurisdiction, Wetmore v. Rymer, 169 U.S. 115, 18 S.Ct. 293, 42 L.Ed. 682 (1898); McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); and may resolve the issue of diversity jurisdiction without an evidentiary hearing, Tanzymore v. Bethlehem Steel Corporation, 457 F.2d 1320 (3rd Cir. 1972).

15. There is no simple test for determining the principal place of business, but the court should attempt to locate the place where daily operations are managed and transacted rather than the place where final policy decisions are made. Kelly v. United States Steel Corp., 284

of the fact that plaintiff bears the burden of establishing that this Court has diversity jurisdiction. McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); Gibbs v. Buck, 307 U.S. 66, 59 S.Ct. 725, 83 L.Ed. 1111 (1939); Tanzymore v. Bethlehem Steel Corporation, 457 F.2d 1320 (3rd Cir. 1972). However, the question of diversity jurisdiction over the first two causes of action need not be finally resolved at this time because this Court has decided to exercise pendent jurisdiction over those causes of action.

▮▮▮▮ The modern understanding of the doctrine of pendent jurisdiction was articulated by the Supreme Court in United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The Court established that the test for pendent jurisdiction includes the dual considerations of judicial power and judicial discretion:

> Pendent jurisdiction, in the sense of judicial *power*, exists whenever there is a claim "arising under [the] Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority . . .," U.S.Const. Art. III, § 2, and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional "case.' The federal claim must have substance sufficient to confer subject matter jurisdiction on the court. Lev-

ering & Garrigues Co. v. Morrin, 289 U.S. 103 [53 S.Ct. 549, 77 L.Ed. 1062]. The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is *power* in federal courts to hear the whole. [Citations omitted]

> That power need not be exercised in every case in which it is found to exist. It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; . . . 383 U.S. at 725–726, 86 S.Ct. at 1138–1139.

The disposition of defendant's motion for summary judgment leaves no question that plaintiff BFG's trademark infringement claim has sufficient substance to confer subject matter jurisdiction on this Court. The only issues remaining are whether CRM's contract claims have sufficient commonality with BFG's trademark infringement claim to empower this Court to hear them jointly, and if so, whether this Court should exercise its discretion to do so.

The first, second, and fourth causes of action all arise from the same set of negotiations and agreements. BFG and

---

F.2d 850 (3rd Cir. 1960); Quaker State Dyeing & Finishing Co., Inc. v. ITT Terryphone Corp., 461 F.2d 1140 (3rd Cir. 1972). The factors leading this Court to determine that ATI Caribe's principal place of business is Puerto Rico are the following, among others:

(1) ATI-Caribe's factory and all of its other assets are located in Puerto Rico.

(2) Except for the President and the Secretary-Treasurer, all of the corporation's officers and all of its 380 employees live and work for the corporation exclusively in Puerto Rico.

(3) 92% of the operating expenses are incurred in Puerto Rico.

(4) Day-to-day operations, including final acceptance of orders, labor relations, de-

velopment of specifications, shipping, purchase of raw materials, community relations, and supervision of manufacturing, are managed by a highly-paid plant manager in Puerto Rico.

(5) All Board of Directors meetings take place and decisions are reached in Puerto Rico.

(6) ATI-Caribe is qualified to do business only in Puerto Rico.

(7) All the corporation's revenue is realized in Puerto Rico.

(8) All outside financing of the corporation has been done in Puerto Rico and all health insurance, unemployment insurance, and workmen's compensation policies are carried there.

its subsidiary CRM owned all of the assets of the footwear plant at Cabo Rojo and sold them jointly to ATI. The Closing Agreement between CRM and ATI provided that execution of the BFG–ATI Agreement was "a condition precedent" to the obligations of the parties. Similarly, execution of the CRM–ATI Agreement was a "condition precedent" to the parties' obligations under the BFG–ATI Agreement. The two Closing Agreements were negotiated simultaneously by the same representatives of the parties and had a common origin in the letter agreement of June 9, 1972. The BFG–ATI agreement contains a warranty that the representations made by CRM to ATI were true and correct. Clearly, the facts underlying the obligations of the parties to these agreements are of a piece.

Moreover, it appears to the Court that proof of BFG's trademark infringement claim and the defenses thereto is likely to overlap considerably with proof of CRM's two contract claims and the defenses thereto. The resolution of the fourth cause of action depends more on the law of contract than of trademark; the critical issue will not be whether there has been technical infringement here, but whether it was the intention of the parties to this contract to transfer the property rights in these marks along with the other assets involved in the sale. Similarly, the intention of the parties will be central to the disposition of the first two causes of action. Plaintiffs' claims all arise out of the same sale transaction, and if considered without regard to their federal or state character, these claims could be expected to be tried in one judicial proceeding.

The power of federal courts under the doctrine of pendent jurisdiction to add pendent parties as distinguished from pendent claims is still open to question. Surely the *Gibbs* criterion for pendent jurisdiction, that there be a "common nucleus of operative fact," can be met equally when there is a pendent party as when there is a pendent claim.[16] However, in Moor v. County of Alameda, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973), a case involving a pendent party defendant, the Supreme Court characterized the problem of pendent party jurisdiction as "a subtle and complex question with far reaching implications," 411 U.S. at 715, 93 S.Ct. at 1799, and was not required by the facts of that proceeding to resolve it. The Court refrained from deciding the question of pendent party jurisdiction for the reason that "the Court should not be quick to sweep state law claims against an entirely new party within the jurisdiction of the lower federal courts which are courts of limited jurisdiction—a jurisdiction subject, within the limits of the Constitution, to the will of Congress, not the courts." 411 U.S. at 715, 93 S.Ct. at 1798. Perhaps this consideration has less weight where, as here, the defendant is already before the Court, and pendent party plaintiff seeks to try state law claims related to the federal claims.

In any event, in absence of a limitation on the *Gibbs* doctrine by the appellate courts or by Congress, this Court will follow the broad mandate of *Gibbs* and find that it has the *power* to hear the first two causes of action. A canvas of the case law of other circuits reveals ample authority for the exercise in a federal cause of action of pendent jurisdiction over state-law claims involving a non-diverse pendent party.[17] See, Leather's Best, Inc. v. S. S. Mormaclynx, 451 F.2d 800 (2d Cir. 1971); Astor-Honor, Inc. v. Grosset & Dunlap, Inc., 441 F.2d 627 (2d Cir. 1971); Davis v.

16. See, generally, Note, UMW v. Gibbs and Pendent Jurisdiction, 81 Harv.L.Rev. 657, 662–664 (1968).

17. Hymer v. Chai, 407 F.2d 136 (9th Cir. 1969), the leading case for the proposition that federal courts lack pendent party jurisdiction was discredited by the Supreme Court in *Moor*, 411 U.S. at 713–715, 93 S.Ct. 1785.

United States, 350 F.Supp. 206 (E.D. Mich.1972); Schulman v. Huck Finn, Inc., 350 F.Supp. 853 (D.Minn.1972). Similarly, courts in this Circuit have frequently taken jurisdiction over pendent parties in diversity tort cases presenting "closely related claims based, in principal part at least, on the same operative facts." Jacobson v. Atlantic City Hospital, 392 F.2d 149, 153 (3rd Cir. 1968). See also, Nelson v. Keefer, 451 F.2d 289 (3rd Cir. 1971); Wilson v. American Chain & Cable Co., 364 F.2d 558 (3rd Cir. 1966); Borror v. Sharon Steel Company, 327 F.2d 165 (3rd Cir. 1964); Townsend v. Quality Court Motels, Inc., 338 F.Supp. 1140 (D.Del. 1972); Newman v. Freeman, 262 F. Supp. 106 (E.D.Pa.1966). Both sets of precedents support the power of this Court to hear CRM's contract claims arising out of the same operative facts as BFG's trademark infringement claim.

Having decided that it has the power to hear the first two causes of action, this Court finds no persuasive reasons why it should not exercise its discretion to do so. Considerations of judicial economy, convenience, and fairness to the litigants all encourage resolution of all the disputes over the sale of the Cabo Rojo facility in a single forum. Judicial resources will be conserved by limiting the dispute to a single proceeding. Inconvenience and unfairness to the defendant are minimal here because ATI is already before the Court and will be required, in any event, to respond to BFG's contract claim as well as its trademark infringement claim. Despite defendant's assertion to the contrary, this Court finds no likelihood *ab initio* of jury confusion between the claims of CRM and BFG. Because the central issue in all the claims will be construction of a single contractual arrangement, the Court will not be required to hear vastly different sets of proofs, and a joint trial of all the claims should be judicially manageable.[18]

In summary, defendant's motion for partial summary judgment is hereby denied, and defendant's motion for dismissal is also hereby denied.

Submit order in accordance herewith.

---

18. By way of contract, see Scovill Mfg. Co. v. Dateline Elec. Co., Ltd., 319 F.Supp. 772 (N.D. Ill.1970).